CHICAGO TITLE & TRUST COMPANY,
Complainant,

v.

FOX THEATRES CORPORATION,
Defendant.

Application of Kenneth STEINREICH and Leopold Porrino, as Trustees of Assets which were of Fox Theatres Corporation, and on behalf of beneficiaries of their Trust, comprising creditors and stockholders of Fox Theatres Corporation, now known respectively as Preferred Participants and Participants of said Trust, Petitioners,

v.

CHASE NATIONAL BANK OF CITY OF NEW YORK et al., Respondents.

United States District Court
S. D. New York.
March 1, 1960.

Hirson & Bertini, New York City, for petitioners; Jay Leo Rothschild, David G. Haskins, Arnold A. Hackmyer, New York City, of counsel.

Robert Aronstein, New York City, for First Nat. Bank of Georgia, as Trustee, etc., a creditor.

Milbank, Tweed, Hope & Hadley, New York City, for respondents Chase Nat. Bank of City of New York and others, appearing specially for the purpose of making this motion; A. Donald Mac-Kinnon, Janet P. Kane, New York City, of counsel.

Mudge, Stern, Baldwin & Todd, New York City, for respondents American Express Co., General Precision Equipment Corp. and National-Simplex-Bludworth, Inc.; Paul D. Miller, Leonard Garment, Bernard Nemtzow, New York City, of counsel.

Telsey & Lowenthal, New York City, for respondents Randforce Amusement Corp., Samuel Rinzler and Emanuel Frisch, as Executors under the Last Will and Testament of Louis Frisch, Deceased, and Rinfriss Corporation and Samuel Rinzler; Leon G. Telsey, New York City, of counsel.

Sherpick, Regan & Davis, New York City, for respondent Skouras Theatres Corp., appearing specially for the purpose of making this motion; William C. Woodson, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

This application is in the nature of a summary proceeding in an equity receivership commenced in this court in early 1932. It is before me on motions by various of the respondents to dismiss the petition on a variety of grounds.

The first objective of the proceeding is to vacate and set aside an order made in the equity receivership on November 17, 1933 by the late Martin Manton, then the Senior Circuit Judge of the Circuit Court of Appeals of this Circuit, sitting in the District Court. That order authorized the then equity receivers, William E. Atkinson and John F. Sherman,

to make a settlement of claims against various of the respondents named in the petition, and others, for the recovery of assets alleged to have been unlawfully transferred from the defendant Fox Theatres Corporation prior to the receivership, said to amount to more than $20,000,00. Many of these claims were the subject of a plenary action brought by the receivers against Fox Film Corporation, certain of the respondents, and others, in the New York State courts.

Petitioners charge that the order of November 17, 1933 approving the settlement was "tainted with fraud and corruption" and that Judge Manton was corruptly induced to sign it to cover up extensive frauds which it is claimed that respondents had perpetrated upon Fox Theatres Corporation, its creditors and stockholders. Petitioners seek to have the order vacated and set aside and to have all steps and proceedings taken under it nullified. They also seek other far-reaching relief to which I will refer later.

### Parties

On January 30, 1939 an order of Judge Manton was entered in this receivership confirming a plan proposed by the then equity receivers for the realization upon and liquidation of the assets of defendant Fox Theatres Corporation. The plan contemplated the creation of a trust to be administered and enforced by the Supreme Court, New York County, which was analogous in its functions to a corporation set up to realize upon and distribute the assets of a receivership estate. The realization plan was described by the court as one "which would terminate the equity receivership, but which contemplates continuous liquidation of the corporate assets".

Pursuant to the plan a deed of trust was executed as of February 24, 1939 for the benefit of the creditors and stockholders of defendant Fox Theatres. Trustees were duly designated by Judge Manton and the deed was duly filed with the County Clerk of New York County. All of the property and assets of the equity receivership and of Fox Theatres Corporation were transferred to and vested in the trustees under the deed of trust. Participating certificates were issued to the Fox creditors and stockholders entitled to share in the assets. Duly designated trustees have been carrying out the terms of the trust under the supervision of the New York Supreme Court ever since.

The petitioners in this proceeding are the present trustees under this deed of trust. They derive whatever status they may have to maintain the proceeding solely from their capacity as such trustees.

The more than thirty parties named in the petition as respondents include a banking corporation, eight other corporations, fifteen individuals, the erstwhile equity receiver in the Delaware Chancery Court of one of the corporations named, three persons named individually and as co-partners, and the executors of two decedents. A number of the respondents are the successors in interest of persons alleged to have participated in the transactions complained of.

### The Relief Sought

The petition consists of fifty printed legal-sized pages containing ninety-seven separately numbered allegations, many of which are in turn sub-numbered. It is more than a little difficult to summarize its allegations. It is petitioners' theory that beginning in 1930 various of the named respondents, the predecessors in interest of other respondents, and many others named and unnamed, engaged in a vast and far-reaching conspiracy to milk Fox Theatres Corporation of assets worth many millions of dollars,' in derogation of the rights of its creditors and stockholders. The conspiracy is said to have culminated in this equity receivership and in the allegedly corrupt order of November 17, 1933 approving the settlement by the equity receivers of the claims to recover fraudulently transferred assets. It is claimed that the equity receivership was collusive, that the settlement made by the receivers was grossly and unconscionably inadquate

and insufficient and that the order authorizing the settlement and its consummation was made as the result of the corruption of Judge Manton. Petitioners' counsel summarizes their position as follows:

"The conspiracy alleged was to denude Fox Theatres of its assets; to transfer them to the Respondents, and then, by a Court order authorizing the settlement, to regularize the despoliation."

In addition to vacating and setting aside the order of November 17, 1933 authorizing the settlement and its consummation the petition also seeks (1) a declaration that all "proceedings, transfers, releases, covenants not to sue, and other instruments and assurances of title", pursuant to or under the authority of such order, be declared void; (2) a decree requiring that the respondents, "their assignees and transferees" account to petitioners for "all properties, monies and other assets of Fox Theatres * * * received by them or on their behalf or for their account or coming into their possession, and to return, reassign, retransfer and redeliver same * * * or if same are no longer in their possession or susceptible of physical retransfer and redelivery * * *, then and in that event to pay to petitioners the fair monetary value thereof, together with the accumulations, profits and receipts therefrom"; (3) a judgment for "such sums, damages, profits, interest, costs, disbursements and counsel fees" as are appropriate; (4) a judgment that all the respondents are guilty of contempt of this court and providing punishment therefor; and (5) items of ancillary relief.

The Issues Now Before the Court

This proceeding was commenced by the service on various of the respondents of an order to show cause made on December 9, 1954 and the accompanying petition. Respondents Chase National Bank, Bender, Van Kleeck and Aumack, individually and as co-partners doing business as Bender & Co., American Express Company, General Precision Equipment Corporation, National-Simplex-Bludworth Corporation, Inc., Skouras Theatres Corporation, Randforce Amusement Corporation, Rinfriss Corporation, Samuel Rinzler, and the executors under the will of Louis Frisch, deceased, appeared specially for the purpose of moving to dismiss the portions of the petition and order to show cause which sought to set aside the settlement order of Judge Manton of November 17, 1933. After conference with Chief Judge Knox before whom all remaining matters in this receivership were then pending, a stipulation was entered into with the approval of the court, permitting the special appearance of these respondents for this limited purpose and reserving to them the right to answer the petition or to make other motions directed, among other things, (1) to the sufficiency of the petition generally, (2) the right of petitioners to proceed summarily rather than by plenary action, (3) the capacity of the petitioners to institute and maintain the proceeding, and (4) the jurisdiction of the court over the trust res. These respondents then made motions to dismiss the petition upon the grounds (1) that it failed to state facts upon which the order of November 17, 1933 could be set aside and declared void or facts showing that the order of any proceedings had pursuant thereto was the result of any fraud or misconduct on the part of officers of the court; (2) that the petition was barred by the time limitations of Rule 60(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., since it was not made within a reasonable time and no facts were set forth justifying delay; (3) that petitioners were guilty of gross laches to the great prejudice of respondents; (4) as to some of the respondents that petitioners were precluded from the relief sought because they had made it impossible to restore the status quo ante; and (5) that there has been a prior binding adjudication of the underlying claims asserted in the petition.

Petitioners then sought an order to show cause bringing on motions by them to strike the special appearances filed by

the moving respondents, to "dismiss" their motions to dismiss the petition, to compel them to answer the petition, and for other relief. That order to show cause was never signed. Some time thereafter this matter was assigned to me for all purposes. At a conference of counsel before me it was determined that the court would hear and determine the issues of law (1) as to whether the petition failed to allege facts showing that the order of November 17, 1933 under attack, and proceedings taken thereunder, were the result of any fraud or corruption on the part of officers of this court, and (2) as to whether any defenses of laches might be available to the respondents under the circumstances. All other questions raised by respondents' motions to dismiss were reserved for future determination if that should be necessary.

These are the only issues before me at this point.

### The History and Background of This Equity Receivership

The questions raised must be viewed against the background of the long and troublesome history of this hoary equity receivership. Much of this background is murky. Some of it is obscure. And almost all of it is replete with complications. The key events with which this proceeding is concerned took place more than a quarter of a century ago.

In June 1932, when this receivership commenced, Judge Manton was Senior Circuit Judge of the Circuit Court of Appeals of this Circuit. At that time there was, as the Supreme Court said in Johnson v. Manhattan Ry. Co., 289 U.S. 479, 483, 53 S.Ct. 721, 723, 77 L.Ed. 1331:

"[A]n acute controversy between the Senior Circuit Judge of the Second Circuit and the District Judges of the Southern District of New York respecting the authority of a judge specially assigned to that district—particularly the Senior Circuit Judge when so assigned—to entertain an application for the appointment of receivers in a suit in equity."

In so far as that controversy affected the present equity receivership the Supreme Court said, 289 U.S. at pages 483–484, 53 S.Ct. at page 723:

"In 1930 the Senior Circuit Judge, acting under 28 U.S.C. § 22, and reciting that the public interest required it, assigned himself to hold at any time a session or sessions of the District Court for that district, for the purpose of trying causes and entertaining and disposing of any matter which might come before him.

"In June, 1932, at the suggestion of counsel in an intended suit in equity for the appointment of receivers for the Fox Theatres Corporation, the Senior Circuit Judge sought informally to persuade one or more of the District Judges that a trust company ought not to be selected as receiver, but failed to secure an acceptance of his view. Thereupon, acting under his assignment of 1930, he entertained the application for a receiver and appointed individual receivers."

The controversy between Judge Manton and the District Judges had arisen primarily over the practice of the District Judges in not infrequently selecting as an equity receiver the trust company which was designated by District Court Rules as a standing receiver in bankruptcy cases.

The Johnson case did not involve this receivership but another equity receivership involving the Interborough Rapid Transit Company, one of the principal transit facilities in the City of New York. Equity receivers had been appointed by Judge Manton in that case after he had assigned himself to hold a District Court for the Southern District of New York. His action in so doing was collaterally attacked. The Supreme Court held that the Senior Circuit Judge had the power so to assign himself and to appoint receivers in the suit in equity. However, the court said that Judge Manton had acted "hastily and evidently with questionable wisdom" and that his ac-

tion had embarrassed and was continuing to embarrass the receivership. The court suggested that it would be the part of wisdom for him to withdraw from further participation in the receivership proceedings under the circumstances. Thereafter Judge Manton withdrew from the Interborough case.

However, no question appears to have been raised in this receivership as to the propriety of its being before Judge Manton or as to his power to appoint the receivers, and he continued to handle it until his resignation from the bench in 1939.

On June 22, 1932 Judge Manton appointed as temporary receivers William E. Atkinson, President of defendant Fox Theatres, and John F. Sherman, who appears to have had no connection with the defendant, any of the respondents, or any of the transactions alleged to have taken place prior to his appointment.[1] On July 12, 1933 their appointment was made permanent. The order appointing permanent receivers directed them to institute such actions as were necessary to protect the trust estate.

On June 30, 1933 the receivers commenced an action in the New York Supreme Court against Fox Film Corporation and others. They named as defendants in that action all but seven of the respondents, or the predecessors in interest of the respondents, named in the

petition now before me though it does not appear how many of them were actually served. In August of that year the original complaint was discontinued by stipulation and an omnibus complaint in a similar action of broader scope was prepared by the receivers.

One of the defendants named was Daniel O. Hastings, who, on February 29, 1932, had been appointed by the Chancery Court of Delaware as receiver of the property and assets of General Theatres Equipment Co., Inc., which then held voting control of Fox Film Corporation. Three other complaints against Fox Film Corporation alone were also prepared by the receivers.

The various actions commenced or contemplated by the receivers, Atkinson and Sherman, embraced a substantial portion of the transactions which are alleged in the petition now before me to be part of the conspiracy to milk Fox Theatres Corporation of its assets by means of fraudulent transfers and preferences. Chase Bank, Chase Securities, Fox Film and General Theatres were alleged to have been principal actors in this series of transactions designed to divert assets from Fox Theatres, it being alleged that Chase Bank and Chase Securities, under the domination of Albert H. Wiggin, Chairman of Chase Bank, controlled General Theatres and Fox Film as well as Fox Theatres.[2]

---

1. On August 16, 1932 Alfred Blumenthal, a creditor of Fox Theatres who is named as a respondent and co-conspirator in the proceeding at bar, moved to vacate the order of June 22, 1932 appointing the temporary receivers, and all orders entered thereafter, on the ground that the proceedings were "collusive, sham, fictitious, in bad faith and of ulterior motive". He alleged a collusive and fraudulent scheme to milk Fox Theatres of its assets, to place it in friendly equity receivership, and to have Atkinson appointed as receiver for the purpose of prejudicing and defrauding its creditors. The motion was denied by Judge Manton.

2. Most of these same charges were litigated in an action brought in 1932 in the Supreme Court, New York County, by Chicago Title & Trust Company against William Fox. Fox impleaded as additional

defendants Fox Film Corporation, Fox Theatres, Chase Bank, Chase Securities Corporation, General Theatres Equipment and Hastings, as its receiver, among others, charging conspiracy to strip Fox Theatres of its assets and force it into a friendly receivership in order to defraud its creditors, of whom Fox was one. After a lengthy trial the late Sol M. Stroock, a distinguished member of the New York Bar, acting as referee, found in a 118 page opinion rendered in 1936, that no such conspiracy existed and that there was no merit to the charges. In the course of his opinion he carefully reviewed many of the transactions which the instant petition charges were part of the respondents' conspiracy. Chicago Title & Trust Co. v. Fox., N.Y.Sup.Ct., Index No. 31588 (1932), judgment entered June 2, 1936, app. dism. (1st Dept.) N.Y.L.J. December 18, 1936, p. 2288, not officially reported.

Archibald R. Watson, who had been appointed as attorney and solicitor for the receivers, and his partner Wilguss, instituted the litigation on the receivers' behalf. After negotiations between the receivers and their counsel, Hastings, as receiver of General Theatres, the attorneys for Fox Film Corporation, and others, a settlement was agreed upon.

Under the terms of the proposed settlement the receivers of Fox Theatres were paid the sum of $500,000 in cash and received 2,500 shares of the capital stock of William Fox Isis Investment Co. which owned the Fox Isis Theatre in Denver, Colorado, which had previously been given by Fox Theatres to Fox Film as collateral security for an indebtedness. This stock was valued at some $330,000. Claims of approximately $4,000,000 filed against the Fox Theatres Corporation in receivership by defendants in the action, their subsidiaries, or persons whom they controlled, were withdrawn and released. Various releases were mutually exchanged and among those so released were Fox Film, General Theatres and its receiver, National Theatres Equipment, Chase Bank and Chase Securities Corporation. In addition it was provided that Hastings, as receiver of General Theatres, should transfer to Fox Film substantially all the stock of Movietone News, Inc. held by him, which represented fifty percent of the outstanding stock of that company, together with certain notes of Movietone News, in part payment of certain claims.

On or about October 24, 1933 Hastings, as receiver of General Theatres, filed a petition in the Delaware Chancery Court setting forth the terms of the proposed settlement and asking authority to consummate it. Full notice of this petition was given to all stockholders and creditors of General Theatres and was published in New York and other newspapers. On November 17, 1933 Hastings was authorized by the Delaware Chancellor to consummate the settlement.

On November 15, 1933 Watson, counsel for Atkinson and Sherman as receivers, served on the attorneys for the plaintiff in this receivership, the attorneys for the defendant, attorneys for Fox Film, and the attorneys for William Fox and Ben Leo, creditors who had appeared, notice of an application returnable November 17, 1933 for an order approving the settlement. It appears that this notice was served on all parties and intervenors in the Fox Theatres equity receivership though no notice was given to creditors generally. The petition on the application, prepared by counsel for the receivers, set forth in some detail the various claims of Fox Theatres against the defendants named in the omnibus complaint, discussed and commented upon them and gave, in summary form, the terms of the proposed settlement.

On November 17 a hearing was held before Judge Manton on the receivers' application for approval of the settlement. One creditor of Fox Theatres appeared at the hearing and objected to the proposed settlement though on what grounds does not appear. Judge Manton then signed the order dated November 17, 1933 approving the settlement as proposed and authorizing its consummation. Thereafter the settlement was consummated. This is the order which the petitioners here seek to set aside as tainted with fraud and corruption.

On December 4 and 5, 1933, some three weeks after the entry of the order under attack, Atkinson and Sherman, as receivers, and Watson, their attorney, filed separate applications for allowances for services through November 1933. These petitions referred in considerable detail to the settlement and its terms. On January 4, 1934, less than seven weeks after the order of November 17 had been entered, a hearing was held before Judge Manton on the report of the receivers for the preceding six months, recommending that the business of Fox Theatres be continued for another six months. Notice of this hearing was served by mail on all known creditors and was duly published. The receivers' report discussed at some length the terms of the settlement which had been approved by Judge Manton and the Delaware

Chancellor on November 17, 1933. There is no doubt that the creditors of Fox Theatres were thoroughly familiar with the fact that the settlement had been approved and consummated for there are numerous references to the settlement and its terms in various petitions and applications filed during the course of the receivership.

On February 25, 1934 John F. Sherman died and was succeeded as co-receiver by Milton C. Weisman on August 16, 1934. On September 18, 1934 Atkinson resigned as co-receiver and Weisman continued as sole receiver. On September 28, 1934 Watson, who had been counsel for the receivers since the inception of the proceedings, resigned and was succeeded by Basil O'Connor.

In December 1938 Weisman, as sole receiver, filed with the court the plan for realization upon and liquidation of the assets of Fox Theatres Corporation to which I have previously referred. After a hearing was held on the plan on notice to all of the creditors it was duly approved on January 30, 1939, and Weisman and Kenneth Steinreich, one of the present petitioners, were appointed as trustees. As I have indicated, the plan provided for a realization and liquidation trust to be administered by the Supreme Court, New York County, and all of the assets and property of the receivership and of Fox Theatres was turned over to this trust which has since been administered by the state court.

In the meantime, in the summer of 1938 an investigation was commenced of the judicial activities of Judge Manton, and in February of 1939, shortly after the approval of the Fox realization plan, Judge Manton resigned. On June 6, 1939 Judge Manton was indicted for conspiracy to obstruct the administration of justice and to defraud the United States, and thereafter was convicted. See United States v. Manton, 2 Cir., 107 F.2d 834. It may be noted that none of the persons who were indicted with Judge Manton were in any way involved in the present proceeding and the matters alleged in the indictment bore no relation to

the Fox Theatres receivership or anything involved therein.

In April 1939 Weisman, the then receiver of Fox Theatres, and Atkinson, on behalf of himself and his deceased co-receiver Sherman, filed final accounts in this court. Objections were filed to the accounts by a stockholders committee and by Robert Aronstein, as attorney for the Trust Company of Georgia as trustee, one of the creditors. Judge Knox, to whom by then the receivership had been assigned for all purposes, referred the objections to Nathan A. Smyth as Special Master to hear and report. The objections to the receivers' accounts filed by Mr. Aronstein attacked, among other things, the settlement approved by the order of November 17, 1933 upon grounds similar to those which are raised here.

At about the same time Judge Knox requested the then United States Attorney, John T. Cahill, to make an investigation of the Fox Theatres receivership. Aronstein was permitted to cooperate. By August 30, 1940, an indictment had been filed by a Grand Jury in this court against George B. Skouras, Harvey P. Newins, one of the respondents in this proceeding, Skouras Theatres Corporation, another of the respondents, and Ktima Corporation, charging a conspiracy to bribe Judge Manton in connection with an order of January 12, 1937, entered in the receivership which approved the sale of the capital stock of William Fox Realty Corporation, a wholly owned subsidiary of the defendant, together with a lease of the Academy of Music Theatre, to Skouras Theatres Corporation. This order had been entered upon the application of Weisman, as receiver, over the objections of a Fox Theatres stockholders committee.

On the basis of the information set forth in the Skouras-Newins indictment and other information obtained through the investigation made by the United States Attorney, Aronstein, representing the Trust Company of Georgia, applied in March 1941 to set aside the order of January 12, 1937 which had approved the

sale to Skouras Theatres Corporation. After extended negotiations, on June 27, 1944 an order was entered approving a settlement under which the property conveyed to Skouras Theatres Corporation pursuant to the order of January 12, 1937, was returned to the Fox realization trustees. The indictment returned against Skouras, Newins and the two corporations arising out of this transaction was never brought to trial.

During the course of 1944 the United States Attorney filed with Judge Knox a memorandum as to his results of investigations of the Fox Theatres receivership. This memorandum dealt primarily with the course of the receivership subsequent to the time when the receivership of Atkinson and Sherman had been terminated. It indicated that no evidence of impropriety had been uncovered in the course of the investigation with respect to the earlier phases of the receivership or with respect to the order of November 17, 1933, though the investigation had not been directed to those phases of the matter.

On November 27, 1945 an order was entered on application of Aronstein approving a settlement for $40,000 of the objections raised on behalf of the Fox Theatres trustees to the accounts of Weisman as receiver. Weisman's accounts as receiver were thereupon approved and Weisman and his surety were discharged. Thereafter on March 19, 1946 a settlement in the sum of $35,000 with the sureties on the bonds of Atkinson and Sherman as receivers, Atkinson having also died in the meantime, was approved by Judge Knox. The accounts of Atkinson and Weisman were then approved and they and their sureties were discharged.

On May 1, 1946 Judge Knox, on the application of Aronstein, entered an order enlarging and extending the scope of the hearings theretofore authorized before Mr. Smyth as Special Master, "to hear evidence and take testimony concerning all transactions had by the receivers herein respecting or pertaining to the assets of Fox Theatres Corporation and its subsidiary and affiliated corporations". The order further provided that Aronstein was authorized to present evidence before the Special Master. Continuation of the hearings before the Special Master was authorized by Judge Knox on May 7, 1952. On May 6, 1957, shortly after this matter was assigned to me, I signed an order appointing a new Special Master to succeed Mr. Smyth, who had died, and authorizing further continuation of the hearings before him.

Aronstein, representing the Trust Company of Georgia as creditor, assisted by counsel for the trustees of the realization and liquidation plan, has been presenting evidence before the Special Master over a period of some ten years. According to the petitioners scores of witnesses have been examined, over ten thousand pages of testimony have been taken, there are hundreds of exhibits and thousands of pages of records in various actions and proceedings in other courts have been examined. On November 27, 1950, after negotiations between Aronstein and counsel for Twentieth Century Fox Film Corporation, successor to Fox Film Corporation, a settlement was agreed upon of all claims between Fox Theatres and these corporations. The settlement was approved by an order entered by Judge Knox on November 27, 1950. It was predicated upon claims that Fox Film Corporation and other parties had been participants in the same conspiracy alleged in the present petition which is claimed to have led to the settlement approved by Judge Manton's order of November 17, 1933. Under the terms of this settlement Twentieth Century Fox paid the sum of $200,000 to the trustees of the Fox realization trust. Twentieth Century Fox, its predecessor corporations, and a number of the alleged co-conspirators, who are alleged to have participated in the transactions alleged in the petition now before me, were released by the trustees. However, the trustees expressly reserved their rights against the respondents named in their present petition.

The present petition was filed in December 1954, more than four years later.

## The Present Posture of the Receivership

I have given no more than an outline of some of the salient facts in the long history of this receivership, stretching as it does over more than a quarter of a century. The facts to which I have referred have been culled from an enormous record and are merely in capsule form. However, an understanding of these facts, at least, is essential since they bear on the present posture of this receivership and the very limited purposes for which it remains open in this court. They also indicate the setting in which the petition and the questions now raised with respect to it must be viewed.

The present posture of the equity receivership in this court may be summarized as follows:

All of its assets have been vested for twenty years in the trustees of the realization trust under the jurisdiction of the Supreme Court, New York County. During that period the trustees have been functioning and carrying out their duties under the trust indenture. The trustees are not officers of this court. None of the assets vested in them have been in the possession, custody or control of this court and its officers since the plan for realization and liquidation was consummated.

Any questions concerning the consummation and the execution of the plan have long since been disposed of and the successive equity receivers have been fully released and discharged for over ten years. While the equity receivership in one sense remains open in this court the purposes for which it remains open are severely limited. When Judge Knox designated a special master to hear evidence in connection with transactions of the receiver, he did not retain jurisdiction over the equity receivership per se.

He was merely exercising a power inherent in the court to ferret out and rectify frauds committed upon it through the corruption of its own officers. This power was exercised subsequent to the consummation of the plan for realization and liquidation only because of questions raised as to the conduct of officers of the court during the course of the receivership itself.

The orders of Judge Knox authorizing the taking of testimony before the special master and the presentation of such testimony by Aronstein representing creditors, did not reopen generally the terminated receivership proceeding nor in any way impair or vitiate the consummated realization plan. The plan remained in full force and effect and the receivership remained terminated except in so far as steps were being taken to discover whether there was any evidence of corrupt conduct on the part of officers of the court, and particularly of Judge Manton, in relation to this receivership.

There is no doubt about the power of the court to do this whether the equity receivership per se was terminated or not. Indeed, if there was such corruption the court is under a duty to take whatever action may be appropriate to sustain its integrity and to undo any harm or injustice which has resulted. See Root Refining Co. v. Universal Oil Products Co., 3 Cir., 169 F.2d 514; Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250.

But this is the only purpose for which this court retains any powers over this long since terminated receivership. Unless it is shown that its officers have acted corruptly or fraudulently and that in order to uphold the integrity of the court some action should be taken to rectify resulting wrongs or injustices, this court has no power or jurisdiction whatsoever over the receivership nor may it entertain any applications made in it.[3]

---

3. I have already held in Chicago Title & Trust Co. v. Fox Theatres Corporation (Steinreich v. Sterling Bank and Trust Co.), D.C., 178 F.Supp. 899, that this court has no jurisdiction to entertain summary proceedings brought by the trus-

Thus, the question now presented as to whether the petition states facts sufficient to show that the order of Judge Manton of November 17, 1933 was brought about by the corruption of officers of the court goes to the heart not only of the petitioners' right to relief but also of the power of this court to entertain a summary application of this nature at all.

## The Nature of the Present Proceeding

No facts had been presented to the court prior to the filing of the present petition showing that the order of November 17, 1933 was the result of corrupt conduct of its officers. Up to that point there were only the suspicions which had been voiced by Aronstein and his associates.

The question now presented is whether the petition filed shows that such facts, as distinguished from mere suspicion or conjecture actually exist.

This is not a proceeding which the court has already authorized as petitioners' counsel seem to think. Even less is it a proceeding brought by the court on its own motion. It is not "the adversary portion of the investigation ordered by this court in May 1939", nor is it part of "an investigatory and punitive proceeding conducted by the court itself", as counsel for the petitioners have claimed it to be.

This is an adversary proceeding brought by private litigants, the petitioner-trustees, who seek to set aside the order of November 17, 1933 in order to recover large sums for the benefit of the creditors and stockholders whom they represent. The action taken by the court thus far has in no way set the seal of its approval upon this proceeding, nor have petitioners' counsel been designated as officers of the court for the purpose of prosecuting it.

The only action which the court has thus far taken is to permit Mr. Aron-

stein, as counsel for an interested creditor, to present testimony before a special master regarding the acts and proceedings of the receivers in an effort to ascertain what facts, if any, exist to support suspicions that there may have been corruption of officers of this court. The order of Judge Knox of May 1, 1946 enlarging the scope of the hearings before the special master, which had previously been confined to hearing testimony on the objections to the accounts of the receivers, provided that "evidence upon said hearing may be *presented* by Robert Aronstein, Esq. as attorney for First National Bank of Atlanta, Georgia, or any other of the parties herein". It directed that the expenses of the hearing, including the fees of the special master, should be a charge upon and paid out of the assets of the Fox realization trust but that "any counsel fees shall be contingent upon and allowed and paid only out of any assets which are hereafter recovered and shall be in such amounts as may be ordered by this court". My order of May 6, 1957 appointing a new special master did not enlarge the scope of Judge Knox's previous order.

Having presented evidence before the special master for some eight and a half years after the entry of Judge Knox's order, Aronstein and the petitioners now must make a proper showing that the order of November 17, 1933 was brought about by the corruption or fraud of officers of the court before they can be permitted to maintain such a proceeding as this. Far from it making no difference "what the petition states", as petitioners have claimed, whether or not its allegations are sufficient makes every difference.

■■ The long lapse of time since the transactions with which the petition is concerned took place, the enormous scope and wide ramifications of such transactions and the difficulties of defending adequately against charges a

tees of the Fox realization trust in the equity receivership to enforce rights which do not arise from alleged corrup-

tion of officers of the court in the course of the receivership.

quarter of a century after the event, and intervening changes of status and position, all make it imperative that facts constituting corruption be clearly and specially alleged. Neither the fact that, through Aronstein's efforts, substantial sums were recovered for the estate by way of settlement in other unrelated proceedings, nor the fact that Judge Manton was convicted of the crime of obstructing justice in quite another connection, nor the fact that there were reasonable grounds to believe that corruption may have occurred in later phases of this receivership, are substitutes for allegations of fact showing that fraud and corruption existed with respect to the specific order of settlement signed by Judge Manton on November 17, 1933 which is sought to be set aside. This is the foundation upon which all else rests and unless such foundation is firm and sound the whole structure erected by the petitioners must fall.

The many underlying transactions alleged in the petition to be part of a grandiose conspiracy are exceedingly complex. They relate to complicated intercorporate and financial dealings which took place in the midst of the depression of the early 1930's. They involve numerous persons and corporations in addition to the thirty-odd named as respondents. The relationship of one transaction to another and of the various actors to one another is unclear.

Plainly an enormous burden will be placed on the respondents if they are required to go to trial on these charges. Such a trial would entail large expenditures of money, time and effort. The mere lapse of time and the intervening deaths of many if not most of the persons who are alleged to have participated in these transactions would make the task exceedingly difficult. Moreover, a number of the respondents are merely the successors in interest to the original participants and there have been many intervening changes in status, corporate and otherwise.

Quite apart from any questions of laches on the part of the petitioners and

to respondents' prejudice, it would be unjust to require respondents to undertake a full scale defense against the allegations of the petition unless it has been shown that there are sound grounds upon which it can be maintained.

This court will not shrink from putting respondents to their defense if it is shown that injustice or fraud resulted from the corruption of its officers. But the burden is on the petitioners to make such a showing in their petition.

### The Tests Which the Petition Must Meet

As the Supreme Court said in Stearns v. Page, 48 U.S. 819, at page 829, 12 L.Ed. 928, a leading case in this field, where the court refused to set aside an order made twenty-six years before on the ground that fraud had been practiced on the court:

" * * * But as lapse of time necessarily obscures the truth and destroys the evidence of past transactions, courts of chancery will exercise great caution in sustaining bills which seek to disturb them. They will hold the complainant to stringent rules of pleading and evidence, and require him to make out a clear case. Charges of fraud are easily made, and lapse of time affords no reason for relaxing the rules of evidence or treating mere suspicion as proof. If a defendant can be compelled to open settled accounts, to explain or prove each item, after a lapse of near thirty years, by general allegations of fraud,—if the fraud can be proved by his inability to elucidate past transactions after so great a length of time, or by showing some slips of recollection or by contradicting him in some collateral facts by the frail recollection of other witnesses—no man's property or reputation would be safe."

In United States v. Throckmorton, 98 U.S. 61, at page 64, 25 L.Ed. 93, in affirming a dismissal on demurrer of a petition attacking a decree twenty years

after it was rendered, the court, emphasizing the lapse of time, said:

"But we think these are good reasons why a bill which seeks under these circumstances to annul a decree thus surrounded by every presumption which should give it support, shall present on its face a clear and unquestionable ground on which the jurisdiction it invokes can rest."

Quite apart from lapse of time or intervening circumstances, it is settled at common law and provided by the Rules of Civil Procedure that circumstances constituting fraud must be alleged with particularity. Rule 9(b) of the Federal Rules of Civil Procedure provides:

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

This is a restatement of the long standing rule at common law. See Stearns v. Page, supra; United States v. Throckmorton, supra; Chamberlain Machine Works v. United States, 270 U.S. 347, 46 S.Ct. 225, 70 L.Ed. 619; Zaring v. Strauss & Co., 9 Cir., 30 F.2d 313; Barnes v. Boyd, D.C.S.D.W.Va, 8 F.Supp. 584, affirmed 4 Cir., 73 F.2d 910, certiorari denied 294 U.S. 723, 55 S.Ct. 550, 79 L.Ed. 1254; 2 Moore, Federal Practice, (2d edition), p. 1907.

Mere general allegations that there was fraud, corruption or conspiracy or characterizations of acts or conduct in these terms are not enough no matter how frequently repeated. Aetna Casualty & Surety Co. v. Abbott, 4 Cir., 130 F.2d 40; Voliva v. Bennett, 5 Cir., 201 F.2d 434; Curacao Trading Co. v. William Stake & Co., D.C.S.D.N.Y., 2 F.R.D. 308; Martin v. Clayton, D.C.S.D.N.Y., 6 F.R.D. 214. Nor do statements of "malice, intent, knowledge, and other condition of mind" in general terms under the last sentence of Rule 9(b) substitute for particularization of the circumstances constituting the fraud charged. See

United States v. Hartmann, D.C.E.D.Pa., 2 F.R.D. 477.

As the Supreme Court said in Chamberlain Machine Works v. United States, supra, 270 U.S. at page 349, 46 S.Ct. at page 226:

"The general allegations of 'fraud' and 'coercion' were mere conclusions of the pleader, and were not admitted by the demurrer. * * * To show a cause of action it was necessary that the petition state distinctly the particular acts of fraud and coercion relied on, specifying by whom and in what manner they were perpetrated, with such definiteness and reasonable certainty that the court might see that, if proved, they would warrant the setting aside of the settlement."

See, also, Stearns v. Page, supra; Schultz v. Manufacturers & Traders Trust Co., D.C.W.D.N.Y., 1 F.R.D. 53; In re Burton Coal Co., D.C.N.D.Ill., 57 F.Supp. 361, affirmed 7 Cir., 126 F.2d 447, 449.

Fraud cannot be presumed, (United States v. Wunderlich, 342 U.S. 98, 100, 72 S.Ct. 154, 96 L.Ed. 113; United States v. Colorado Anthracite Co., 225 U.S. 219, 226, 32 S.Ct. 617, 56 L.Ed. 1063), and, indeed, any presumption there may be is against it. Prevost v. Gratz, 19 U.S. 481, 5 L.Ed. 311. Facts must be alleged which, if proven, would constitute fraud or which lead clearly to the conclusion that fraud has been committed. Barnes v. Boyd, supra.

These requirements are strictly enforced when it is sought to impeach an order or decree of the court, especially one of such long standing as the order under attack here. Stearns v. Page, supra; McCampbell v. Warrich Corp., 7 Cir., 109 F.2d 115, certiorari denied 310 U.S. 631, 60 S.Ct. 1077, 84 L.Ed. 1401; Davis v. State Bank of Woodstock, 7 Cir., 151 F.2d 180; Barnes v. Boyd, supra; In re Burton Coal Co., supra.

The portions of the petition which purport to show that the order of November 17, 1933 is tainted with fraud and corruption must meet these tests. They are

not the less applicable because the fraud and corruption charged is that of the court's own officers.

This charge as to the order of November 17, 1933 is the keystone of the petitioners' case as petitioners themselves recognize. Any rights they might have to assert underlying claims embraced in the plenary actions brought by the receivers which were settled pursuant to the order of November 17, 1933 are entirely dependent upon first setting aside the order and the settlement which it approved. That in turn is dependent on whether their petition has sufficiently alleged that fraud and corruption was committed by officers of this court with respect to that order.

The Allegations of the Petition as to Corruption with Respect to the November 17, 1933 Order

An analysis of the rather confusing and obscure allegations of the petition makes it plain that it does not state facts which show, or from which the conclusion can be drawn, that the order of November 17, 1933 was the result of fraud or corruption on the part of officers of the court.

(1)

First it should be noted that while the petitioners make certain allegations with respect to the institution of this equity receivership and the appointment of the receivers by Judge Manton, they do not seek to set aside anything which was done in the course of the receivership other than the order of November 17, 1933 and the settlement it approved. Indeed, the only status petitioners may have to maintain this proceeding as trustees of the Fox realization trust is dependent upon the receivership and orders issued by Judge Manton in the course of it. It was Judge Manton who approved the plan of liquidation under which the realization trust was set up and who designated the original trustees, one of whom is a petitioner here.

Thus, this is not an attack on the entire receivership proceeding ab initio nor an attempt to unscramble all that has been done in it over a period of twenty-five or more years. The allegations as to the institution of the receivership and the appointment of the receivers are of significance only in so far as they bear on the fraudulent and corrupt conduct charged with respect to the November 1933 order.

(2)

The first time it is claimed that Judge Manton came into the picture is in June of 1932. It is alleged in substance that Harry Kosch, who on May 18, 1932 had been appointed receiver of Roxy Theatres Corporation, which had some affiliations with Fox Theatres, by another judge of this court, after conferring with Atkinson, the newly elected president of Fox Theatres, procured the services of one Newins "who was then friendly or engaged in business transactions" with Manton to arrange for a conference with reference to the appointment of a receiver and attorneys for the receiver of Fox Theatres. Newins is alleged to have arranged for such a conference at which it was "agreed" that Manton would "designate himself" as a District Judge to take jurisdiction of the application and appoint Atkinson as sole receiver and an attorney for him. Newins is not alleged to have been present at the conference, nor to have done anything other than to "arrange" it. All this is characterized as "irregular, unlawful and corrupt" and "based upon an illegal consideration" and for the "purpose" of having a friendly receiver appointed to block any actions for fraud against respondents.

It is then alleged that Manton designated himself as District Judge, assumed jurisdiction and appointed Atkinson as receiver and John F. Sherman as co-receiver. It may be noted Atkinson was not appointed sole receiver as had allegedly been arranged, but a co-receiver was appointed who is not alleged to have had any connection with the "conspiracy" or with any of the respondents. However, he is alleged to have been "a close friend and business associate of a trusted friend and benefactor of said Manton". Though the petition makes no reference to the

fact, Archibald Watson, a well known member of the New York bar was appointed attorney for the receivers.

This is all that is said about the initial stages of the receivership. Stripped of adjectives, characterizations and conclusions none of these allegations show any fraud or corruption on the part of Manton or the receivers either bearing on the order of November 17, 1933 or otherwise.

The allegations as to Manton's designation of himself as a District Judge for the purpose of taking jurisdiction over the receivership are of course inaccurate. As the Supreme Court pointed out in Johnson v. Manhattan Ry. Co., supra, 289 U.S. at page 484, 53 S.Ct. 721, Manton was acting under a designation of himself as District Judge which had been made in 1930. But apart from this it is plain that such designation and assignment by Senior Circuit Judges was a common and long standing practice in all circuits but one, and fully within their powers. Johnson v. Manhattan Ry. Co., supra. There is nothing in such an assignment on which to predicate a charge of fraud or corruption.

It was entirely in order for Manton to appoint as one of the co-receivers the president of the large enterprise which was being placed in receivership. It was equally in order for him to appoint a co-receiver who, as far as appears from the petition was disinterested. There is nothing improper in a "friendly" receivership. These are common and long accepted practices which have been followed not only in equity receiverships but in proceedings under Section 77b and Chapter 10 of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. See In re Metropolitan Ry. Receivership, 208 U.S. 90, 28 S.Ct. 219, 52 L.Ed. 403; Kingsport Press v. Brief English Systems, 2 Cir., 54 F.2d 497, certiorari denied sub nom. Owen v. Kingsport Press, Inc., 286 U.S. 545, 52 S.Ct. 497, 76 L. Ed. 1282; Guaranty Trust Co. v. International Steam Pump Co., 2 Cir., 231 F. 594, certiorari denied sub nom. Lewis v. International Steam Pump Co., 241

U.S. 676, 36 S.Ct. 725, 60 L.Ed. 1232; Lincoln Printing Co. v. Middle West Utilities Co., D.C.N.D.Ill., 6 F.Supp. 663, affirmed 7 Cir., 74 F.2d 779, certiorari denied sub nom. Pollak v. McCulloch, 295 U.S. 746, 55 S.Ct. 659, 79 L.Ed. 1691.

The fact that Kosch, a receiver appointed by this court, talked to Manton about the appointment of receivers for a company in which his receivership estate had some interest, is certainly not even a remote indication of fraud or corruption on the part of anybody. The allegation that Sherman was a friend of "a trusted friend and benefactor" of Manton, accepted as true, adds nothing. Quite apart from the fact that the "trusted friend and benefactor" is not named or again referred to anywhere in the petition, there is nothing to show that he had anything to do with anybody else in the case or the slightest connection with the respondents or the alleged conspiracy. Plainly a judge would be unlikely to appoint a co-receiver who was unknown to him.

Then there is the allegation that Newins, who is alleged to have "arranged" but not participated in the conference between Kosch and Manton, was hired by Kosch in the Roxy receivership, by Atkinson in the Fox Theatres receivership and "subsequently" was placed on the payroll of Skouras Theatres and that the Fox receivers paid Newins his "emolument" of some $400 and later $200 per week by check, "many of which checks were cashed by Kosch as receiver of Roxy". The hiring of Newins by Atkinson is alleged to have been "as a reward to Newins and any other persons with whom Newins might share said reward".

This is a prime example of the petitioners' attempts to establish fraud by innuendo rather than by allegations of fact. The petition is replete with matter of this character. Newins' escutcheon is now tarnished because of his connection with the Skouras Theatres-Academy of Music sale in this same receivership in 1937, four or more years after the events alleged here and his indictment for his part in that transaction. Manton

is discredited by his later conviction, his connection with the Skouras deal and other transactions. Skouras Theatres was the moving factor in the Academy of Music deal and appears to have been involved in bribery of Manton in that connection. None of these matters are claimed to have anything to do with the transactions involved in this proceeding. Yet petitioners' language leaves the subtle suggestion that corruption here should be implied because of the blemished reputations of Newins, Manton and Skouras in quite different connections.

The references to "any other persons with whom Newins might share the 'reward' ", to the fact that Kosch cashed Newins' checks and to employment of Newins by Skouras at some later unspecified date emphasize the wisdom of requiring that specific facts showing fraud must be stated.

There is nothing in the allegations thus far discussed to show or lead to the conclusion that there was any fraud or corruption on the part of anybody.

(3)

 We now turn to the only allegations regarding the settlement and the signing of the order approving it, the key point of petitioners' case. Instead of alleging concrete facts the allegations become even weaker.

It is alleged that Manton suggested to Archibald Watson, the solicitor for the receivers, whose integrity is not questioned, that before serving a complaint against Fox Film he confer with Kent, president of Fox, and that Kent and Manton "were known to each other either directly or through common friends or business associates". Then Manton is alleged to have asked the co-receiver Sherman what he knew concerning the settlement negotiations. Sherman is said to have explained the details to Manton and also explained that Senator Hastings, the Delaware Chancery receiver of General Theatres, had called on the receivers' "Special Counsel unsolicited at the suggestion of someone he met in Chicago who knew of said Special Counsel's identity with the receivership and of the suggestion by said Special Counsel to Hastings that he call on the solicitor for the receivers of Fox Theatres Corporation".

How any of these facts tend to show corruption of Manton is beyond me. Manton had every right to inquire about the negotiations. See In re Nevitt, 8 Cir., 117 F. 448. The Delaware receiver had the right and, indeed, the duty to talk to counsel for the Fox Theatres about a proposed settlement. That Manton may have known someone who knew Kent, which is highly likely, is utterly irrelevant in the absence of other facts. All this amounts to is an attempt at sly innuendo without any foundation in fact whatsoever.

The allegation is also made that "the business and personal relationships between said Manton and certain persons, firms or corporations (or their respective servants, agents or employees) interested in [the plenary] action by Sherman and Atkinson, as receivers, as against Fox Film Corporation, et al., were not disclosed by said Manton" to the Fox Theatres creditors "as they should have been." Nowhere is the nature of these relationships stated. The persons with whom they were maintained are not identified. No facts are alleged to show what bearing, if any, they have upon anything which occurred in the Fox Theatres receivership. These allegations are wholly insufficient to show that there was anything which should have been disclosed to the creditors, much less that Manton was disqualified from passing on the settlement. See Morse v. Lewis, 4 Cir., 54 F.2d 1027; In re Fox West Coast Theatres, 9 Cir., 88 F.2d 212, certiorari denied sub nom. Talley v. Fox Film Corp., 301 U.S. 710, 57 S.Ct. 944, 81 L. Ed. 1363; Duncan v. United States, 9 Cir., 48 F.2d 128, certiorari denied 283 U.S. 863, 51 S.Ct. 656, 75 L.Ed. 1468; In re Nevitt, 8 Cir., 117 F. 448. See, also, Wierin v. Shubert Theatre Corp., 2 Cir., decided May 13, 1942, rehearing denied November 14, 1945, unreported.

### (4)

With this slim background, totally devoid of any facts spelling out fraud and corruption of any of the officers of the court who are involved in the receivership, we come to the signing of the order of November 17, 1933 by Manton. The allegations are made (1) that no proper notice of the settlement was given to the Fox creditors, and (2) the settlement was "patently, grossly, completely, wholly and unconscionably inadequate and insufficient".

I have already referred to the facts concerning the procedure as to notice and hearing on the proposed settlement (see supra at page 25 of 182 F.Supp.) and I will not repeat them. It is admitted that notice was given to all parties and intervenors in the receivership action and that one of the creditors did appear at the hearing.

Under the then Equity Rule IV of this court all matters were to be heard "upon such notice to the parties and creditors as [the judge] shall prescribe". There was no requirement that notice be given to all creditors of an application for approval of a settlement made by the receivers. The notice given in this instance was the same as that given on all of the numerous applications for settlement made throughout the course of the receivership until the transfer of assets to the trustees in 1939.

It might even be argued with some plausibility that this was an administrative matter (see Petition of Baxter, 6 Cir., 269 F. 344) which under Rule IV could be disposed of ex parte.

But even if the notice given was inadequate the important fact is that there was no attempt to conceal the settlement from the creditors or to brush it under the rug. On the contrary it was referred to at length in the fee applications of the receivers and their counsel filed less than three weeks after the order of approval. It was brought specifically to the attention of all creditors in the receivers' semi-annual report filed less than seven weeks after it was consummated and in numerous later reports and applications in the course of the receivership.

It may be noted, moreover, that the settlement was also approved by the Delaware Chancery Court upon application of the receiver of General Theatres after full notice served on creditors and published in New York and other newspapers.

There is nothing to support the petitioners' conclusions that the creditors were not notified in order to conceal the terms of the settlement. Nor is there anything alleged showing that the order of November 17, 1933 was void per se even if that question could be raised at this stage of the proceedings in the absence of fraud and corruption.

The characterizations as to the inadequacy of the settlement are mere conclusions of the petitioners. The petitioners apparently are under the misapprehension that the more adjectives they use to characterize the settlement the stronger become their allegations. No facts have been alleged to support such conclusions.

There is no showing as to the value of what the various parties to the settlement received or gave up under it. The terms are not even stated.

Yet the records of this court show that the receivers obtained for the estate in the settlement some $830,000 and the release of claims aggregating almost $4,000,000. The difficulties of litigating the matters in controversy were plainly enormous. Such difficulties, like attendant expense, inconvenience, delay and uncertainty of success, are, of course, major factors in settlement. Moreover, it must be remembered that the settlement was made in the depths of the depression and no doubt was affected by the economic conditions then prevailing.

Such facts as appear in the court records belie the petitioners' mere conclusions that the settlement was inadequate. No factual basis has been shown to indicate that it was inadequate at all, to say nothing of its being so inadequate overall as to shock the conscience of the court and justify setting it aside. See

Gelfert v. National City Bank, 313 U.S. 221, 61 S.Ct. 898, 85 L.Ed. 1299; Graffam v. Burgess, 117 U.S. 180, 6 S.Ct. 686, 29 L.Ed. 839; In re Burr Mfg. & Supply Co., 2 Cir., 217 F. 16; Bethlehem Steel Co. v. International Combustion Engineering Corp., 2 Cir., 66 F.2d 409; In re Riggi Bros. Co., Inc., 2 Cir., 42 F.2d 174; In re Paley, D.C.S.D.N.Y., 26 F.Supp. 952. No facts are alleged to show or lead to the conclusion that the settlement resulted from fraud and corruption on the part of the officers of the court who participated in it.

(5)

Petitioners urge that regardless of whether any of their separate allegations concerning the acts of Manton and the receivers state facts showing corrupt conduct,

"They must be viewed as part and parcel of the conspiracy of respondents achieving its purpose to dissipate Fox Theatres property rights through the complicity and connivance of Judge Manton. That Judge Manton could legally—if with proper motives—have done or omitted to do one or more though obviously not all of these acts * * * is beside the point *if it be assumed in accorddance with Petitioners' allegations that Judge Manton's acts were corrupt,* and that the very acts which he could have lawfully done—had he acted in good faith and in performance of his duty—became defiled by the circumstance that he lent himself and his high office to the object of accomplishing Respondents' nefarious purposes." (Italics supplied).

The difficulty with petitioners' position is that it is based on the *assumption* that their allegations show that Judge Manton's acts were corrupt. If that assumption were correct petitioners might have smoother sailing. But their allegations do not state any *facts* making such a showing. Assuming that a conspiracy of the nature alleged existed, there are no allegations of fact showing,

or from which it can be concluded, that Manton became a part of it, or, in petitioners' words, "lent himself and his high office to the object of accomplishing Respondents' nefarious purposes".

The petitioners' characterizations, conclusions and innuendos are not a substitute for absent allegations of fact. Such allegations, for example, as that acts were done "as a result of frauds and fraudulent practices and conspiracies perpetrated and entered into" by respondents, add nothing in the absence of facts from which it could be concluded that this is what occurred.

The Authorities on Which Petitioners Rely

In United States ex rel. Accardi v. Shaughnessy, 2 Cir., 206 F.2d 897, 904, Judge Frank pointed out in the course of his dissenting opinion:

"An attack on an official's decision, by recourse to off-the-record evidence, is not allowed if the allegations are vague: Legality should be more than well-ordered paper work, but allowable peering behind the paper facade has its limits. One may not compel an official to submit to court room interrogation in the search for possible concealed, unlawful behavior, unless one first brings forward some striking traces of it. As a consequence, well-concealed misconduct may escape judicial correction. That is the price we pay to avoid having governmental action at the mercy of everyone who voices mere suspicions. For instance, to open up the judgment in the Root Refining case [Root Refining Co. v. Universal Oil Products Co., 3 Cir., 169 F.2d 514] it would not have sufficed to allege, without more, 'the judge was bribed'. There must be an offer to prove specific facts which will pretty plainly impugn the official record."

See, also, Judge Frank concurring in United States v. Scully, 2 Cir., 225 F.2d 113, at page 117.

Petitioners place their main reliance on Root Refining Co. v. Universal Oil

Products Co., 3 Cir., 169 F.2d 514, certiorari denied sub nom. Universal Oil Products Co. v. William Whitman Co., 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444, to which Judge Frank referred. However, rather than supporting their position here the case points up its deficiencies.

In the case at bar there has been no offer to prove "specific facts which will pretty plainly impugn the official record" nor, indeed, have petitioners "brought forward some striking traces" of unlawful behavior on the part of officers of the court. It is not even alleged that "the judge was bribed". All that is alleged are conclusions that conduct otherwise lawful was corrupt.

In contrast, in the Root case there were allegations of specific facts showing beyond question a judge had been corrupted and had rendered a corrupt decision.

In the Root case the Court of Appeals of the Third Circuit instituted proceedings on its own motion to reopen one of its judgments because of a corrupt conspiracy between Judge Davis, one of its judges, and Kaufman, an attorney employed by Universal, one of the litigants. Davis and Kaufman had been indicted in 1940 for obstruction of justice. Upon the trial of the indictment the jury disagreed.

At the instance of parties affected by the judgment on appeal, who asserted that the evidence at the criminal trial indicated that Judge Davis had been bribed, the court in November 1941 appointed a special master to investigate the charges.

After taking extensive evidence the special master reported that the judgment on appeal had been obtained through the corruption of Judge Davis by Kaufman. The Court of Appeals approved the findings of its special master and vacated the judgment.

The Supreme Court reversed (Universal Oil Products v. Root, 328 U.S. 575, 578, 66 S.Ct. 1176, 90 L.Ed. 1447) on the ground that there had not been a proper adversary proceeding. The Court

of Appeals then vacated its order setting aside the judgment on appeal but on its own motion ordered Universal, who had employed Kaufman, to show cause why the judgment should not be vacated because of fraud upon the court. It authorized the Attorney General of the United States to appear as amicus curiae.

The Attorney General as amicus filed a "Statement of Ultimate Facts" supporting the charges of fraud which would "operate as a pleading under the Rules of Civil Procedure". That statement set forth the following facts:

There was an arrangement between Kaufman representing Universal and Judge Davis whereby Davis was to perform judicial favors for Universal in return for financial benefits out of monies paid to Kaufman by Universal. The benefits were by way of a $10,000 loan from Kaufman to Stokely, a relative of Davis, which was not a bona fide business transaction. Kaufman obtained the $10,000 loaned to Stokely from $25,000 paid to him by Universal the day after certiorari had been denied by the Supreme Court in the cases which Davis had decided in its favor. Kaufman performed no legal services of any value in the cases and was retained and paid solely because he was an intimate of Davis. Davis decided the cases in favor of Universal in return for the financial benefit received from Kaufman. Davis and Kaufman had a continuing corrupt relationship during this period by which Davis, in return for financial benefits from Kaufman, was to favor Kaufman's clients, one instance of which was a bribe paid to Davis by William Fox in return for which Davis had decided bankruptcy matters before him entirely in favor of Fox.

The Attorney General followed this statement with a document entitled "Notice of Issue and Proofs in Support" thereof which set forth the evidence on which he relied to show the corruption of Davis by Kaufman resulting in the decisions in favor of Kaufman's client Universal. This document went into the details of the facts set forth in the pre-

vious "Statement of Ultimate Facts" and elaborated on them. For example, it gave the dates, places and circumstances of the meetings between Davis and Kaufman, the circumstances under which Kaufman was retained for the sole purpose of influencing Davis, the details of the checks received by Kaufman from Universal and the deposit of them in his bank account, the delivery of Kaufman's checks on this account to Stokely by Davis's law clerk, the payment by Stokely to Davis of $1,400 for his own use, the payment of $27,500 to Davis by Fox at the instance of Kaufman, and the decision of five bankruptcy appeals in Fox's favor on opinions written by Davis in consideration for the bribes received.

There is no question that specific facts were alleged showing the corruption of Judge Davis and a fraud upon the court. Respondent Universal never raised such a question. Universal's motions were directed to a dismissal of the entire proceeding on the ground there was no justiciable controversy under the Constitution and were denied.

The Court of Appeals ordered that a hearing be held to determine whether Davis's judicial acts had been corruptly influenced by Kaufman. Its order was based upon the allegations of specific wrongdoing set forth by the Attorney General, and specific findings by the special master that Davis and Kaufman had been guilty of fraudulent and corrupt conduct, which the court had previously adopted.

After a hearing before the Court of Appeals, without the intervention of a special master, the court found, in detail, that Davis had been corruptly influenced by Kaufman to decide in favor of Universal, and that Davis had also been bribed in the Fox matters. It ordered that the judgment which had previously been entered in favor of Universal should therefore be vacated and Universal's suits dismissed.

There is no doubt that the Root case stands squarely for the proposition that a court has the inherent power to inquire into the integrity of its own judgments and to set them aside when fraud or corruption of its officers has been shown. But it does not hold directly or by implication that the court should permit an adversary proceeding of the nature of the one at bar to proceed in the absence of facts showing that such fraud or corruption existed.

The other cases on which petitioners place reliance, Hazel-Atlas Co. v. Hartford Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; Dick v. Marr, D.C. S.D.N.Y., unreported, Equity No. 50–59, and the Academy of Music proceeding in this equity receivership do not hold so either.

In the Hazel-Atlas case the Supreme Court found that the proof of fraud was "conclusive".

In Dick v. Marr, an elaborate petition filed by the Government as amicus curiae charged that plaintiff had perpetrated a fraud on the court by suppressing evidence. Evidence of the fraud had come to light as a result of an indictment filed against plaintiff. The sufficiency of the petition was never attacked though, after hearing, the court found that fraud had not been established.

The original Academy of Music petition was dismissed though it annexed a copy of an indictment charging a conspiracy to bribe Judge Manton to bring about the sale which was sought to be set aside. The amended petition specifically charged that a bribe in the amount of $20,000 had been paid to Manton by check of Skouras, one of the conspirators, and delivered to him by Newins, another of them. Thus petitioners in the Academy of Music matter were required to and did allege specific facts showing corruption—allegations which are lacking in the petition at bar.

The proceeding conclusion at bar, quite unlike that in the Root case is not a proceeding instituted by the court on its own motion after a showing of facts constituting corruption. The burden here is on the petitioners as private litigants to allege facts showing corruption or from which it can be concluded that corruption existed with relation to the order they seek to set aside.

The court has given petitioners and counsel for the Trust Company of Georgia, as creditor, ample opportunity to elicit such facts if they exist. Their inquiry before the special master appointed by the court has been pursued for some ten years. It followed an extensive previous investigation by the United States Attorney. Yet petitioners have failed to present any facts in this petition to sustain the charges which they assert.

I will pass over the contention made by the moving respondents, not without some merit, that apart from the failure to show corruption of Manton the petition also fails to allege facts showing their connection with any such fraud or corruption if it had been shown to exist. Nor will I deal with the respondents' contention that the petition is fatally defective in failing to allege affirmatively when the alleged corruption was discovered, and facts showing that it could not have been discovered earlier by the exercise of due diligence, or with the contention that these petitioners have no standing to maintain this summary proceeding. It is unnecessary at this time to pass on these contentions, or on the question of whether, as a matter of law, laches may be raised as a defense.

I hold that the petition is fatally defective in any event for the reason that, accepting its allegations of fact as true, it fails to state facts showing, or from which it can be concluded, that the order of November 17, 1933 was the result of fraud or corruption on the part of officers of the court.

This would ordinarily call for a dismissal of the petition. Moreover, after all that has gone on and all the opportunity which has been afforded petitioners to obtain and present any facts which may exist, to permit the filing of an amended petition would only serve to prolong further litigation on claims which have grown increasingly stale. To do so would not be in accord either with public policy dictating an eventual end to litigation or with sound judicial administration.

However, this is not an ordinary case. Serious charges have been leveled against the integrity of the court itself. There have been protracted hearings at which thousands of pages of testimony have been taken. Manton, against whom these grave charges are made, stands convicted of dishonest judicial conduct in another connection. There is evidence lending support to the claim that in a later phase of this same receivership Judge Manton was corruptly influenced and that Newins and Skouras Theatres, who are named in the present petition, were participants in such corruption. Charges of improper conduct made against the receivers resulted in substantial settlements with them or their sureties. Quite apart from whether any of these facts bear on the present claims, the whole atmosphere surrounding the receivership is unsavory.

All this requires that the court make sure that it has not overlooked any actual evidence of fraud or corruption, if any such evidence exists. I have therefore determined that I will not dismiss the proceeding finally at this time. Instead, adopting a procedure somewhat analogous to that used in the Root case, I will direct that petitioners file with the court a detailed statement of any actual proof which they have showing that the order of November 17, 1933 was brought about by the corruption of Judge Manton. By now such proof, if it exists, must be in the form of testimony or documentary evidence. The statement so to be filed will be accompanied by the excerpts of the testimony and the documentary evidence on which petitioners rely.

The statement will be limited to the specific charge I have just mentioned. It will consist of facts only and will not contain any characterizations, conclusions or innuendos of the petitioners or their counsel. The court will evaluate such evidence as may be presented and will draw its own conclusions.

If it appears from the statement that there is sufficient evidence that the order of November 17, 1933 was the result

of corruption of Judge Manton to justify the maintenance of this summary proceeding, or any action on the court's own motion, then the court will consider and fix procedures for the future conduct of such proceedings as may be appropriate. If, on the other hand, the statement fails to present such evidence the petition will be dismissed and this long drawn out matter will be finally laid at rest.

The statement to be filed by petitioners will be served on the moving respondents who will have opportunity to comment thereon. The times within which petitioners' statement and respondents' comments will be served and filed will be fixed in the order to be entered on these motions which will be settled before me on ten days' notice. When proposed orders have been filed I may, if I deem it necessary, afford the parties an opportunity to be heard with respect to provisions of the order to be signed. Parties will be notified if and when they will be heard in that connection.