**Myron NEISLOSS and Randolph Phillips, Appellants,**

.v.

**John W. BUSH et al., Appellees.**

**No. 15774.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 25, 1961.

Decided June 8, 1961.

Atty. Gen. George C. Doub, at the time the brief was filed, and Messrs. Morton Hollander, Atty., Dept. of Justice, and Arthur J. Cerra, Asst. Gen. Counsel, I. C. C., were on the brief, for appellees.

Before Mr. Justice REED, retired,* and WASHINGTON and DANAHER, Circuit Judges.

Mr. Justice REED, sitting by designation.

This case is a proceeding arising from the acquisition of control of the New York Central Railroad Company by Alleghany Corporation, a Maryland corporation engaged in the investment business. Appellants are two common stockholders of Alleghany. They appeal from the summary dismissal in the District Court of a complaint seeking declaratory and mandatory relief against certain actions taken by the Interstate Commerce Commission with respect to Alleghany's acquisition of control of the railroad. The dismissal was on the ground that no claim was stated upon which relief could be granted.

Since appellants' complaint was dismissed on the pleading, we accept, for purposes of this appeal, the following statement of facts in appellants' complaint. In 1953 Robert R. Young and Allan P. Kirby, Chairman and President of Alleghany Corporation and its controlling stockholders, formed a plan to obtain control of the New York Central by entering and winning a proxy contest in the May, 1954, election of Central's Board of Directors. Young and Kirby personally owned 200,000 shares of Central stock. In addition, Alleghany Corporation at that time held a controlling interest in the Chesapeake & Ohio Railway, and the C. & O. owned 800,000 shares of stock in the New York Central. Young and Kirby naturally wished to vote these shares in the Central election, but were not at once free to do so. The shares were held in a voting trust pursuant to an order of the

Mr. Joseph L. Rauh, Jr., Washington, D. C., with whom Mr. John Silard, Washington, D. C., was on the brief, for appellants.

Mr. Robert W. Ginnane, Gen. Counsel, I. C. C., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Asst.

* Sitting by designation pursuant to 28 U.S.C. § 294(a).

I.C.C. designed to limit the number of carriers under Alleghany's control.[1]

In order to free this Central stock from the voting trust, it was arranged that all of Alleghany's stock in the C. & O. should be sold to Cyrus S. Eaton and that six of Alleghany's nominees on the C. & O. Board of Directors should be removed and a majority of the directorships filled by nominees of Eaton. It was arranged that the C. & O. should sell its 800,000 shares of Central stock to Clint W. Murchison and Sidney W. Richardson, with the buyers agreeing to vote the shares for the directors supported by Young and Kirby. The purchase price of these 800,000 shares was $20,000,000. The buyers obtained this money from two "advances" of $7,500,-000 each by Alleghany Corporation and by certain "banking groups associated with Cyrus S. Eaton interests," and from Kirby's "advance" to Richardson of another $5,000,000. Under certain joint venture agreements, it was agreed that Richardson and Murchison might resell up to 400,000 shares of Central stock to Alleghany within a three-month period at the same price they had paid for the stock. This agreement amounted to an assumption by Alleghany of the risk of loss caused by fluctuations in the market value of the 400,000 shares within the three-month period. Alleghany also loaned $1,300,000 without interest to Young, Kirby, Richardson and Murchison for a period of about three months to finance expenditures in the New York Central proxy contest.

The result was the ouster of the old management of the Central and the election in May, 1954, of the Young-Kirby slate of directors. A concomitant result, it is alleged, was the diversion of a great amount of Alleghany capital from profitable ventures into wasteful expenses and profitless investments. It is alleged that the transactions caused serious financial injury to the corporation and its stockholders.

These transactions formed the basis of three proceedings before the Commerce Commission. Appellants here challenge the disposition in each of the proceedings.

In March, 1954, before the May election which gave Alleghany control of Central, the New York Central petitioned the Commission (presumably under § 13(2) of the Interstate Commerce Act, 49 U.S.C.A. § 13(2), to investigate "upon its own motion" the sale of 800,-000 Central shares to Murchison and Richardson, and to determine whether Alleghany still controlled the C. & O. and whether the stock transactions violated the antitrust laws or the Commission order imposing a voting trust on the Central shares. The Commission, finding no sufficient grounds for investigation, denied the petition.[2] Immediately upon rendering this denial, the Commission received another petition from the New York Central requesting a declaratory order under § 5(d) of the Administrative Procedure Act, 5 U.S.C.A. § 1004(d), that the acquisition of control of Central by Alleghany, Young and Kirby would result in their control of two or more carriers and would therefore require Commission approval under §§ 5(2) and 5(4) of the Commerce Act.[3]

---

1. Chesapeake & Ohio Railway Company Purchase, 261 I.C.C. 239 (1945). The order provided, inter alia, that as long as Alleghany controlled the C. & O., the stock of other carriers owned by either corporation should be deposited with an independent voting trustee, 261 I.C.C. at 241, 262.

2. Petition for Investigation Concerning Alleghany Corporation and the Chesapeake and Ohio Railway Company, April 6, 1954.

3. 49 U.S.C.A. § 5(2) (a):
   "It shall be lawful, with the approval and authorization of the Commission, * * * for any carrier * * * to acquire control of another through ownership of its stock or otherwise; or for a person which is not a carrier to acquire control of two or more carriers * * *

The Commission, noting that the petition was directed to its sound discretion, denied the petition.[4] Appellants took no part in either of these proceedings before the Commission.

The third proceeding arose out of the application on September 20, 1954, by Alleghany and Central (by that time under the control of Alleghany) for Commission approval of the merger of one subsidiary of Central into another and for continuation of Alleghany's status as a carrier as provided by § 5(3) of the Commerce Act.[5] Appellant Phillips intervened as a party to this proceeding. Appellants state that Alleghany had no real interest in the merger itself, which had little or no effect on the operation of the railroads, but used the application as a means of obtaining carrier status under § 5(3). Once such status had been obtained, Alleghany would come under the exclusive jurisdiction of the I. C. C. and would escape what was considered to be the less sympathetic regulation of the Securities and Exchange Commission under the Investment Company Act.[6]

The full Interstate Commerce Commission, affirming a decision of Division 4, approved the merger.[7] Appellant Phillips argued that the Commission had no power to consider Alleghany as a party because its acquisition of control over Central had not been approved by the Commission. Commission approval is required under § 5(2) of the Commerce Act, 49 U.S.C.A. § 5(2), whenever a non-carrier acquires control of "two or more carriers," and, it was argued, the Central was not one carrier but a system of 73 carriers. The Commission held, however, that because the Central was "a single established system," 295 I. C. C. at 17, it was a single carrier for purposes of § 5(2) and Alleghany had not needed Commission approval of its acquisition.

It was also held that under § 5(2) Commission approval was required of the merger of the subsidiaries of Central and that Alleghany was a necessary party to the merger proceedings. Section 5(2) provides that the Commission must approve whenever a non-carrier which already controls one or more carriers acquires control of another carrier; and the merger of one Central subsidiary into another was deemed the acquisition of control of the merged carrier by Alleghany, a non-carrier already controlling a carrier (Central). Having authorized this acquisition by Alleghany under § 5(2), the Commission was empowered by § 5(3) to establish its exclusive jurisdiction by declaring that Alleghany should be considered a carrier, and the Commission did so.

Shortly after this Commission decision, an action was brought by appellant Phillips and another common stockholder in a three-judge district court, convened pursuant to the Urgent Deficiencies Act, 28 U.S.C. §§ 1336, 1337, 2321–2325, to set the order aside, and also to set aside a subsequent order ap-

---

or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier * * *."

49 U.S.C.A. § 5(4):

"It shall be unlawful for any person, except as provided in paragraph (2) of this section, to enter into any transaction within the scope of subdivision (a) of paragraph (2) of this section, * * *".

4. Petition of New York Central Railroad Company and Harold S. Vanderbilt, No. 31535, May 18, 1954.

5. 49 U.S.C.A. § 5(3):

"Whenever a person which is not a carrier is authorized by an order entered under paragraph (2) of this section, to acquire control of any carrier or of two or more carriers, such person thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier * * *."

6. Section 3(c)(9) of the Investment Company Act exempts from the provisions of the Act "[a]ny company subject to regulation under the Interstate Commerce Act * * *." 15 U.S.C.A. § 80a–3(c)(9).

7. Louisville & Jeffersonville Bridge and Railroad Company Merger, 295 I.C.C. 11 (1955).

proving a new issue of preferred stock by Alleghany. The Supreme Court, reversing the District Court, upheld the orders. Alleghany Corp. v. Breswick & Co., 1957, 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726. The Court agreed with the Commission that Alleghany had "control" of Central within the meaning of § 5(2) and that it was thus a necessary party to the merger proceedings. It held therefore that the Commission had the power under § 5(3) to give Alleghany carrier status. The Court expressly declined to decide whether Commission approval of Alleghany's acquisition of Central should have been obtained before Alleghany's take-over of Central. If this acquisition violated the provisions of § 5(4), remedies were available in other proceedings under other sections of the act. The only issue under § 5(2) was, the Court held, whether Alleghany had actual control over Central, not whether it had approved control.[8]

In their complaint before the District Court and in this court these appellants raise two objections to the Commission action described above. First, they say that the Commission erred in holding, in the course of its opinion in the merger proceeding, that Alleghany was not required under § 5(2) of the Commerce Act to obtain Commission approval of its acquisition of control of the Central system. This is the question the Supreme Court found it unnecessary to decide in upholding the Commission's approval of the merger. Appellants' second claim is that all three Commission decisions—the denial of the two petitions of Central as well as the approval of the merger—are

the product of improper influences brought to bear on members of the Commission. Allegations are made of "the giving of considerations of value" to members of the Commission and of secret ex parte approaches to Commissioners by representatives of Young, Kirby and Alleghany, and by various government officials acting on their behalf, all of which influenced the Commission's decisions.

Appellants, in their prayers in the instant proceeding, ask, presumably in the alternative, for relief in a number of forms. They ask that the District Court declare the Commission proceedings to be vitiated for improper influence; that the Commission be directed to hold a hearing itself or before an independent examiner to determine the existence of improper influence; and that the Commission be directed to reopen the prior proceedings so that the questions presented in them may be decided in "untainted" proceedings free from improper influences. They ask also for a declaration that Alleghany's acquisition of control of Central was the acquisition of control of "two or more carriers" and therefore subject to Commission jurisdiction under § 5(2) of the Commerce Act.

In essence, the dispute is simply this: Appellants wish the Commission to investigate the acquisition of control and find it unlawful. The Commission has declined to investigate and has declared that the transaction may stand without its approval. Appellants claim that the Commission's words and course of conduct are the product of both error and impropriety.

---

8. The Supreme Court remanded the case to the District Court to determine whether the stock issue had been properly approved by the Commission. On remand, the District Court held, as it had when the case was first before it, that Commission approval of Alleghany's acquisition of control of Central was required because Central was more than one "carrier" for purposes of § 5(2), and that until such approval had been obtained, it could not approve the stock acquisition. Breswick & Co. v. United States, D.C.

S.D.N.Y.1957, 156 F.Supp. 227. The Supreme Court again reversed and remanded, holding that its prior opinion had left open only the question of whether the stock issue violated the Commerce Act. Alleghany Corp. v. Breswick & Co., 1958, 355 U.S. 415, 78 S.Ct. 421, 2 L.Ed.2d 374. This time the District Court held, without referring to § 5(2), that it was within the Commission's power to approve the stock issue. Breswick & Co. v. United States, D.C.S.D.N.Y.1958, 160 F. Supp. 754.

878

■ It is not altogether clear whether this action was intended as one for judicial review of agency proceedings or as an original action to enforce a statutory right. It will serve analysis to make clear at the outset that in so far as this was intended as an original action asserting a justiciable cause, the complaint must perforce be dismissed for failure to assert a cause of action. Appellants say that they have a "right" under § 5(2) of the Interstate Commerce Act to have the Commission exercise its jurisdiction over the transaction in question. However, we find in that section only an authorization for the Commission to consider and approve transactions of the nature of those here at issue. There is no language of command in the section, and, even were duties found to be imposed on the Commission by that section, there is no reference to stockholders such as appellants (or to any other member of the public, for that matter) which would indicate that they have enforceable rights correlative to the Commission's duties. As it was said in Stark v. Wickard, 1944, 321 U.S. 288, 306, 64 S. Ct. 559, 569, 88 L.Ed. 733, "even where a complainant possesses a claim to executive action beneficial to him, created by federal statute, it does not necessarily follow that actions of administrative officials, deemed by the owner of the right to place unlawful restrictions upon his claim, are cognizable in appropriate federal courts of first instance. * * * To reach the dignity of a legal right in the strict sense, it must appear from the nature and character of the legislation that Congress intended to create a statutory privilege protected by judicial remedies." Compare Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210.

There is nothing in the statute or its history to indicate that Congress, in enacting § 5(2), meant to authorize an original action in the district court, and that it took the extraordinary step of bypassing its expert agency in the matters here involved. These matters call for the exercise of discretion and the practical application of the Commerce Act. See Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 1951, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912; T. I. M. E. Inc. v. United States 1959, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952; cf. NLRB v. Hearst Publications, Inc., 1944, 322 U.S. 111, 130–131, 64 S.Ct. 851, 88 L.Ed. 1170. "[T]he prescription of the statute is a standard for the Commission to apply and, independently of Commission action, creates no right which courts may enforce." Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. at page 251, 71 S.Ct. at page 695. We direct our attention, then, to the question of whether the action was properly before the District Court as an action to review agency proceedings.

■■ Looked at this way, the complaint filed in the District Court discloses at least one basic shortcoming. It is essential that persons complaining of agency errors first exhaust the administrative remedies available to them before seeking redress in the courts. We hold that appellants have failed to do so.

Appellants made the bare allegation in their complaint that they had exhausted their administrative remedies, but the record shows that they have made but scant use of the machinery of the I.C.C. in seeking their ends in this suit. They were not parties to the 1954 applications for a Commission investigation of Alleghany's dealings in the Central stock.[9] One of them, Phillips, was a party to the third proceeding (the merger proceeding), but the object of that proceeding was not the object here sought to be attained, and the proceeding produced only an adverse dictum on the subject of the present suit. At no time have the allegations of improper influence made in the complaint been presented to the Commission. Nor is there any indication in the

9. In point of fact, only one of the appellants was in any position to take part at that time. Appellant Phillips (who took part in the merger proceedings) did not become a stockholder until November, 1954.

record that there has ever been presented a petition under § 5(7) of the Commerce Act [10] for relief from the allegedly unlawful acquisition of Central—despite the unambiguous suggestion by the Supreme Court that this section provides a remedy. Alleghany Corp. v. Breswick & Co., 1957, 353 U.S. 151, 162, 77 S.Ct. 763, 1 L.Ed.2d 726.

Another agency, the Federal Communications Commission, has on its own motion reopened proceedings and appointed an independent examiner to canvass just such claims as are here advanced. This court, which had acquired jurisdiction of the proceedings under statutory appeals, acceded to the Commission's motions for remands to allow the Commission to hold hearings on the allegations. WKAT, Inc. v. Federal Communications Comm., 1958, 103 U.S.App.D.C. 324, 258 F.2d 418; WORZ, Inc. v. Federal Communications Comm., 106 U.S.App.D.C. 14, 268 F.2d 889, mandamus denied 1959, 361 U.S. 805, 80 S.Ct. 104, 4 L.Ed.2d 56. This court has likewise ordered remands in similar circumstances in Massachusetts Bay Telecasters v. Federal Communications Comm., 1958, 104 U.S.App.D.C. 226, 261 F.2d 55; [11] and Sangamon Valley Television Co. v. United States, 1959, 106 U.S.App.D.C. 30, 269 F.2d 221.[12] And there are cases involving other agencies in which courts of appeals have remanded for hearings by the agency on allegations of improper conduct and bias.[13] The Interstate Commerce Commission has given evidence of being no less able to deal candidly with claims of bias.[14]

We do not intend to decide precisely what remedies would be available to appellants should they turn to the Commission. We have noted, however, that the statute seems on its face to offer a way of testing the legality of the acquisition of Central, and that procedures exist for the fair consideration of allegations of misconduct involving agency members.[15] In a case of this delicacy, in which administrative remedies seem so ready at hand, it is incumbent upon appellants to make a far stronger showing that they are without means of administrative redress.

10. 49 U.S.C.A. § 5(7):
"The Commission is authorized, upon complaint or upon its own initiative without complaint, but after notice and hearing, to investigate and determine whether any person is violating the provisions of paragraph (4) of this section. If the Commission finds after such investigation that such person is violating the provisions of such paragraph, it shall by order require such person to take such action as may be necessary, in the opinion of the Commission, to prevent continuance of such violation. * * *"
Cf. Natural Gas Pipeline Co. of America v. Slattery, 1937, 302 U.S. 300, 309, 58 S.Ct. 199, 82 L.Ed. 276.

11. A hearing before a specially appointed examiner has been completed in the Massachusetts Bay case and this court has approved the findings and recommendation of the F.C.C. based on the record of that hearing. Order of January 19, 1961, certiorari denied sub nom. WHDH, Inc. v. F. C. C., 1961, 366 U.S. 918, 81 S.Ct. 1094.

12. See Note, Ex parte Contacts with the Federal Communications Commission, 73 Harv.L.Rev. 1178, 1194; Gellhorn & Byse, Administrative Law 959 (4th ed. 1960). See also WIRL Television Co. v. United States, 1959, 107 U.S.App.D.C. 21, 274 F.2d 83.

13. See Berkshire Employees Ass'n, etc. v. National Labor Relations Bd., 3 Cir., 1941, 121 F.2d 235; United Air Lines, Inc. v. Civil Aeronautics Bd., 108 U.S. App.D.C. 220, 281 F.2d 53 (1960).

14. In another proceeding, eight Commissioners disqualified themselves from considering a case involving Alleghany Corporation on Appellant Phillips' filing of an "Affidavit under Section 7(a) of the Administrative Procedure Act of personal bias and disqualification." Alleghany Corp. Notes, Finance Docket No. 20804 (1959). See 2 Davis, Administrative Law § 12.05 (1958).

15. We express no opinion as to whether the allegations of improper conduct are sufficiently particular as now drafted. Compare Chicago Title & Trust Co. v. Fox Theatres Corp., D.C.S.D.N.Y., 182 F.Supp. 18, 30–40.

This conclusion is strengthened by consideration of cases in which equitable relief has been sought from the fraudulently obtained judgments of courts. Were this such a case, appellants would be met with the rule that such relief is normally allowed only when relief cannot be obtained in the court of judgment.[16] Courts have power to set aside their own judgments procured by fraud, and relief must generally be sought in the court where the fraud was practiced.[17] This principle is applied, so far as is possible, even when the misconduct alleged is dishonesty by a member of a court. See Root Refining Co. v. Universal Oil Products Co., 3 Cir., 1948, 169 F.2d 514.[18]

Like our courts, our administrative agencies are founded on the principle of trust reposed in not only expert but trustworthy hands. Concern for the independence of our regulatory agencies demands our according them more, hardly less, deference than that we accord our brothers on other courts. What we said in Massachusetts Bay Telecasters v. Federal Communications Comm., 1958, 104 U.S.App.D.C. 226, 238, 261 F.2d 55, 67, with respect to allegations of improper attempts to influence certain Commissioners, is applicable here as well:

"Improper influence, if established, going to the very core of the Commission's quasi-judicial powers is certainly critical. We should have the benefit of the Commission's determination in such matters before deciding ultimately what disposition should be made of this case. We recognize the primary responsibility and function of the Commission itself in these particulars.

"Accordingly, it is to be understood that it is for the Commission initially to determine, subject to review in usual course, the competence of its individual members to have participated in the award, but with appropriate findings with respect to its ultimate conclusions."

While we have no inclination to relinquish our responsibility to review agency action in cases properly before us, we do not intend at this stage of the proceeding to usurp the functions of the agency, which are not only to regulate the industry but also to regulate itself.

16. See Restatement, Judgments 619 (1942):

"§ 128. Opportunity to Obtain Other Relief.

"Equitable relief from a judgment will be granted to a party thereto only where adequate relief cannot be obtained by other proceedings.

"Comment:

" * * * Normally the proper procedure when a judgment has been improperly obtained is to take further steps in the court rendering the judgment or to use some form of appellate procedure. Where adequate relief can be obtained in the original action, it is undesirable to permit the substitution of new actions. * * * "

17. See Rule 60(b), Fed.R.Civ.Proc., 28 U.S.C.; Hazel-Atlas Glass Co. v. Hartford Empire Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250.

18. In the Root case the Circuit Court considered allegations that a judgment had been procured by the bribery of one of its former members. The court heard evidence relevant to these allegations, first through a special master and then in a hearing before the court itself. On review of a collateral issue in the case, the Supreme Court commented, "The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question." Universal Oil Products Co. v. Root Refining Co., 1946, 328 U.S. 575, 580, 66 S. Ct. 1176, 1179, 90 L.Ed. 1447. See Chicago Title & Trust Co. v. Fox Theatres Corp., D.C.S.D.N.Y., 182 F.Supp. 18, 39–40.

It is also the policy of the federal law that allegations of bias or prejudice on the part of trial judges be brought first to the challenged judge, not for his decision as to the truth of the facts alleged, but for decision whether sufficient facts are alleged to warrant disqualification. See 28 U.S.C. § 144, Eisler v. United States, 83 U.S.App.D.C. 315, 170 F.2d 273, certiorari granted 1948, 335 U.S. 857, 69 S.Ct. 130, 93 L.Ed. 404, removed from docket 1949, 338 U.S. 189, 69 S. Ct. 1453, 93 L.Ed. 1897.

We hold therefore that appellants have failed to show that they have exhausted the administrative remedies open to them. The decision of the District Court is

Affirmed.