502 F.2d 362
 163 U.S.App.D.C. 360
 Robert E. PHILLIPS, Individually and on behalf of each and
all others similarly situated, et al., Appellants,
v.
E. T. KLASSEN, Individually and in his official capacity as
Postmaster Generalof the United States Postal
Service, et al.
 No. 73-1013.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Jan. 29, 1974.
Decided May 10, 1974, Certiorari Denied Nov. 11, 1974, See
95 S.Ct. 309.
 
 William R. Duff, Washington, D.C., with whom Ivan Frank Kardos, Roswell, N.M., were on the brief, for appellants.
 Eugene B. Granof, Washington, D.C., Atty., U.S. Postal Service, of the bar of the United States District Court for the District of Columbia, pro hac vice by special leave of court, with whom Harold H. Titus, Jr., U.S. Atty., at the time the brief was filed, John A. Terry Derek I. Meier and N. Richard Janis, Asst. U.S. Attys., were on the brief, for appellees. Earl J. Silbert, U.S. Atty., and Gregory C. Brady, Asst. U.S. Atty., also entered appearances for appellees.
 Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 Appellants are former employees of the United States Post Office Department, reorganized in July, 1971, as the United States Postal Service. They accepted offers to resign with retirement benefits and an additional bonus equal to six months pay rather than face the prospect of separation from the Department as part of a reduction in force attendant to the reorganization of the agency. Suing for themselves and on behalf of those similarly situated,[1] they brought an action in District Court seeking a declaration that their retirements were void; they also sought reinstatement with back pay, alleging that under the circumstances their resignations were coerced as a matter of law. The District Court denied plaintiffs' motion for certification as a class action and dismissed the action against all but one of the named plaintiffs, against whom it granted defendants' motion for summary judgment. We affirm.
 
 I. THE EARLY RETIREMENT OFFER
 
 2
 On August 12, 1970, Congress passed the Postal Reorganization Act in an effort to upgrade the nation's postal service. The Act replaced the Post Office Department with the United States Postal Service, an 'independent establishment of the executive branch of the Government of the United States . . ..' 39 U.S.C. 201.
 
 
 3
 The Act was a congressional mandate for reconstruction of the Department and reform of its operations. As part of its task, the new Postal Service sought to streamline its operations and eliminate nonessential departments and personnel. On January 18, 1971, the Acting Assistant Postmaster General, Bureau of Personnel, put the postal staff on notice, in a Memo To All Headquarters Employees, that personnel changes would attend the advent of the new Postal Service, 'and those changes may vary from personnel transfers to reduction in grade to job abolishments, or reduction in force.' (JA 14). This announcement was followed by several months of rumors of large-scale reorganization and a reduction in force, but no further hard information was forthcoming until the middle of May.
 
 
 4
 On May 12, 1971, the Postmaster General, in a Memorandum To Headquarters and Regional Employees (JA 17), announced the reorganization of the Headquarters and Regional management structure of the Postal Service. Postal regions were reduced from fifteen to five, and authority was decentralized. Anticipating major personnel changes, the Postmaster General announced a liberalization of retirement policies coupled with an offer of a bonus equal to six months' salary to those employees who resigned between May 16 and June 15. Additional details were supplied by another Memorandum, issued by the Postmaster General the following day. (JA 20).
 
 
 5
 Normally, a federal employee is entitled to retire with an annuity only if 55 years of age with 30 years of service, or 60 years of age with 20 years of service, or 62 years of age with five years of service. 5 U.S.C. 8336. Section 8336(d) also provides, however, that:
 
 
 6
 An employee who is involuntarily separated from the service, except by removal for cause on charges of misconduct or delinquency, after completing 25 years of service or after becoming 50 years of age and completing 20 years of service is entitled to a reduced annuity.
 
 
 7
 For a number of years, the Civil Service Commission interpreted the statute to mean that resignations submitted upon request in contemplation of a reduction in force constituted 'involuntary' resignations, within the scope of 8336(d). This view was for some time applied with relative informality,[2] but for the three year period between December 10, 1969 and December 8, 1972, this construction of the law was set forth in a published ruling.[3] The Commission stated that the purpose of the interpretation was 'to lighten the impact of current and future reductions in force.' (JA 29). This came about by virtue of the fact that some annuity, albeit less than that given those retiring after full service, was made available to those who resigned in contemplation of a reduction in force. However, the Commission emphasized that 'this procedure is not to be used as a device for coercing employees to give up their retention rights' and outlined certain procedural safeguards.
 
 
 8
 In his Memorandum To Headquarters and Regional Employees, issued May 13, 1971, the Postmaster General invoked the procedures authorized by FPM Letter No. 831-23 (supra, note 3), and requested 'any eligible employee who may desire to retire to submit his resignation in response to this letter.' (JA 105a). In addition, employees who resigned were to receive a bonus equal to six months' pay, payable on January 1, 1972. These benefits were available only for those employees who retired between May 16 and June 15, 1971.[4] Employees retiring thereafter, or those who were separated as part of a reduction in force, would not receive annuities or bonuses. The Postmaster General's Memorandum stated that 'this letter is not intended to coerce eligible employees to resign and forfeit their retention rights, but is simply an extension of the normal retirement opportunities available to employees.' (JA 105b).
 
 
 9
 By June 15, 1971, 1,884 of the 2,740 postal employees eligible for the bonus and for retirement under the liberalized requirements had retired. Included in this group were the five named plaintiffs in this action. Of the five, only appellant Ira S. Greinsky sought administrative review of the action of the Post Office Department before bringing this action. On June 9, 1971, ten days after his retirement, Mr. Greinsky wrote to the New York Regional Office of the Civil Service Commission complaining that he was coerced into retiring. To support his claim, Greinsky relied not only on the alleged impropriety of the retirement scheme of the Post Office Department, but also on representations made to him by his superiors that his job was to be abolished. (JA 49).
 
 
 10
 By letter of June 29, 1971, the Appeals Examiner rejected Greinsky's complaint. Greinsky appealed this decision to the Civil Service Commission's Board of Appeals and Review, repeating his earlier allegations and adding contentions of deception and vindictiveness on the part of his superiors. (JA 54-55). This Board's decision of October 18, 1971, denied relief to Greinsky. (JA 31-34).
 
 II. THE CLASS ACTION
 
 11
 Plaintiffs allege that they represent a class 'composed of more than 1,500 former employees of the United States Post Office Department who were coerced into premature retirement . . .' This definition of the class presupposes a favorable ruling on the very issue raised by the complaint: were the 1,884 postal employees who retired pursuant to these offers invalidly 'coerced'?
 
 
 12
 It is axiomatic that in order for a class action to be maintainable the representative party must adequately protect the interests of those he purports to represent. The concept is as old as the historic remedy of a class suit and as contemporary as the requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure that 'the representative parties will fairly and adequately protect the interests of the class.'
 
 
 13
 In the words of Justice Stone, well known as a student and teacher of Equity: 'The class suit was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable. * * * In such cases where the interests of those not joined are of the same class as the interests of those who are, and where it is considered that the latter fairly represent the former in the prosecution of the litigation of the issues in which all have a common interest, the court will proceed to a decree.' Hansberry v. Lee, 311 U.S. 32, 41-42, 61 S.Ct. 115, 118, 85 L.Ed.2d 22 (1940).
 
 
 14
 Class members whose interests are antagonistic in fact to, or even 'potentially conflicting' with, the interests of the ostensibly representative parties cannot be bound, consistent with the requirements of due process to an adjudication taken in their name. Hansberry v. Lee, supra. Where courts discern that the interests of the named plaintiff are in significant part antagonistic to those of the class he purports to represent, they decline to entertain the action as a class action.[5]
 
 
 15
 A more difficult question is raised when defendant's action is one that may be characterized as injurious by only part of the affected group. In such a situation, the question arises whether the parties to the action in fact represent the interests of thoseaffected. In Dierks v. Thompson, 414 F.2d 453 (1st Cir. 1969), plaintiff employees brought suit to contest management's construction of the terms of a pension plan that was amenable to at least three different interpretations. The opinion by Judge Aldrich for the court noted (p. 456):
 
 
 16
 In order to maintain a class suit plaintiffs must be truly representational (citing Carroll v. American Federation of Musicians, 2 Cir. 1967, 372 F.2d 155, at 162, vacated and remanded on other grounds, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460.) * * * Unless the relief sought by the particular plaintiffs who bring the suit can be thought to be what would be desired by the other members of the class, it would be inequitable to recognize plaintiffs as representative, and a violation of due process to permit them to obtain a judgment binding absent plaintiffs. In the case at bar, while the suing plaintiffs may have been of the opinion that wise management or other factors would cause the fund to grow, others could well have thought that a vested obligation in a fixed amount would be more desirable than to incur investment risks. Under such circumstances the court could not have found that plaintiffs were 'typical' of the former Amerotron employees whom they purported to represent; they were typical of only one of two conflicting groups. Under the Rule, and as a matter of due process, plaintiffs could not represent both groups.[6]
 
 
 17
 In the case before us, challenged action of the Post Office Department was probably received quite differently by different employees. Nearly two thousand postal workers resigned. In all likelihood, some were employees who understood full well that they were to be separated due to the impending reduction in force, and were affirmatively pleased to have the opportunity to resign with retirement benefits and a substantial bonus, pleased that in conjunction with the reorganization Postmaster General Blount had, in his words, 'liberalized the retirement policy for Headquarters and Regional employees.' There may have been others who did not know for a fact how they would be affected by the reduction in force, but were sufficiently aware of their relative seniority and their evaluation by their superiors to make a relatively informed estimate. To them as well, the offer was probably perceived as an enlightened and humane way for the Department to trim its employment rolls. Doubtless there are a substantial number who perceived the situation in the same way as the plaintiffs in this action: the effect of the reduction in force was unknown, and the benefits offered were too sweet to turn away on a gamble of retention.
 
 
 18
 If plaintiffs are successful, all of these employees, in each of these categories, will be governed by a ruling that all the resignations, the extension of annuities, and the payment of the bonuses, all are and always were unlawful. Although the complaint is not without ambiguity, a fair reading is that plaintiffs intend this to be a class action in behalf of all former Post Office employees who retired between May 16, 1971 and June 15, 1971,[7] in response to the suggestion of the Postmaster General. When as here, there is complaint as to injury from an allegedly invalid action of a Government official and the action may be taken as conferring economic benefits or working economic harm, depending on the circumstances of the individual, the foundations of maintenance of a class action are undermined. In view of the likelihood that there will be divergent views among the employees who pursued the voluntary retirement route, as to whether they have been injured or benefited we cannot say the District Court erred in concluding that plaintiffs cannot fairly maintain the action they have brought in behalf of the more than 1,500 former employees.[8]
 
 
 19
 The problems we have identified cannot be avoided merely by saying that it is always open to members of a class to 'opt out' of any relief to which they are held entitled. One point is that some members of the class may not be entitled to the same relief as others in any event. Can reinstatement be ordered as to employees who are now disabled-- perhaps due to conditions arising in other employment? Moreover, as to some employees who took advantage of the retirement offer, questions of estoppel might arise. Without deciding these questions, we point out the dangers of their being buried in the catch-all of the class action. Perhaps even more important is the possibility that the theory now proferred in the class action would expose some members of the retired class to a legal liability, to return the bonus, they are not in a financial position to shoulder.
 
 
 20
 The issue of defining the class, and its proper representation, may arise in some measure in all class actions, but it is not likely to cut as keenly when only future relief is sought, for even an action by one person, or a smaller class, may result in a judgment that has the same impact on the future as a declaratory judgment in a class action. But here there is the added difficulty that the action is one that would trigger affirmative relief, with both monetary consequences and an unscrambling of employment rolls.
 
 
 21
 Plaintiffs seek certification of their class under Rule 23(b)(3) of the Federal Rules of Procedure, which requires that the court must conclude that proceeding as a class action 'is superior to other available methods for the fair and efficient adjudication of the controversy.' In our view, there are strong considerations why that finding was not made, either in support of the 'class' as designated by plaintiffs, or in support of a judicial redefinition of the class in terms of subclasses, see Rule 23(c). The instant action asks the court to invalidate steps taken as part of a massive reconstitution of the nation's postal services. The problem of relief would be formidable if rights were proclaimed on a 'class' basis, especially if reinstatement were a legal right, as claimed.[9] Corollary to reinstatement would be the problem of defining the rights of current employees of the Postal Service.
 
 III. EXHAUSTION OF ADMINISTRATIVE REMEDIES
 
 22
 The foregoing comments provide a context for our ruling that the lawsuit must not only fail as a class action but also, whether viewed as a class action or individual actions, must fail for another reason-- the failure to exhaust administrative remedies.
 
 
 23
 There was no appeal to the Civil Service Commission by any member of the plaintiffs' alleged class except by Greinsky, and his appeal, as we shall see, was grounded not on the injury now alleged as to all members of the class, that the general presentations of the Postmaster General were, in effect, coercive per se, but rather in the claim that Greinsky was coerced by the particular representations made to him.
 
 
 24
 It is a basic principle of judicial review of administrative determinations that the courts are open only to those who have exhausted available administrative remedies. Numerous decisions of the Supreme Court[10] and of this court[11] so hold. The vitality of the rule is underscored by its recent application by the Supreme Court in Sampson v. Murray, 42 U.S.L.W. 4221, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (U.S. February 19, 1974), to a suit by a government employee, protesting an allegedly invalid discharge, who was willing to pursue her appeal to the Civil Service Commission but sought temporary judicial maintenance of the status quo while that remedy was exhausted. The requirement of recourse in the first instance to the administrative processes of the Civil Service Commission is fully applicable to cases in which government employees allege that seemingly voluntary resignations were in fact coerced, Dabney v. Freeman, 123 U.S.App.D.C. 166, 358 F.2d 533 (1965).
 
 
 25
 The doctrine requiring exhaustion of administrative remedies applies to class actions as well as individual actions. While there appears to be some divergence in the opinions as to the circumstances under which exhaustion by one member is sufficient to meet the exhaustion condition for the class action,[12] it is generally agreed that exhaustion by at least one member of the class is a necessary prerequisite for a class action.[13] Where not even one member of the class has either pursued an administrative remedy or shown why one of the exceptions to the exhaustion rule is applicable, there is a barrier, absent unusual circumstances to the class action.
 
 
 26
 In the case at bar, the court's obligation to insist on the exhaustion doctrine is underscored by plaintiffs' effort to upset administrative actions on a broad basis and to embroil the courts in a sweeping ouster and reinstatement program. Plaintiffs' course would deprive the courts of the benefit of the guidance and mechanisms of the Civil Service Commission. If the position advanced by plaintiffs is sound, its timely presentation to the Civil Service Commission might have generated corrective relief that would have avoided hardships that would be attendant upon a court decree at this date. The courts of equity, where class actions are brought, must give consideration to the public interest and inconvenience in determining whether relief should be extended beyond or left short of the relief that would be available in a purely private action. Virginian Ry. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937). Moreover, timely appeals to the Civil Service Commission might well have brought to the force the various subclasses, whose indeterminate nature pulls away from maintenance of the present action on a class basis, and have identified differences in interest, in legal positions, and in available relief, all of which could have been considered by the court in a final ruling on the class suit issues.
 
 
 27
 Appellants rely on the exception that exhaustion is not required when it is certain that established administrative procedures would prove unavailing.[14] Greinsky's appeal, it is argued, was a signal that the Civil Service Commission would not grant relief for resignations taken in response to the postmaster General's memos of May 12 and 13, for it established the Commission's view that the general representations by the Postmaster General were not coercive as a matter of law. As we have already noted, however, Greinsky's appeal was not gounded on the alleged coercion of the general representations made at the highest levels of the Post Office, but was focused on the coercive impact of the particular representation made to him by his immediate superiors, who had allegedly colluded to insure its coercive effect.[15] Moreover, at no time did Greinsky assert that the offer of the Postmaster General was without statutory authority. Since the issue was not before the Commission, its ruling could not in any sense be taken as a considered holding on the contention presented in the complaint.
 
 
 28
 Taking the complaint as filed by appellants Phillips, Karwoski, Flory and Burman as individuals, and passing by the class action allegations, these claims must likewise be dismissed for failure to exhaust administrative remedies. We add to what has already been said that these individuals might have obtained relief from the Commission even assuming it was or would have been of the view that the early retirement option was not of itself coercive, for this would not have precluded the Commission from finding that it did serve to coerce employees of modest experience, responsibility and sophistication.
 
 IV. GREINSKY'S CLAIM
 
 29
 To the extent that Greinsky's claim as an individual reflects a recourse to administrative remedies, summary judgment for dismissing his claim with prejudice was appropriate.
 
 
 30
 Greinsky makes no allegation that he did not fully understand the terms of the Post Office's offer to extend retirement benefits to those who resigned voluntarily. He signed a statement on May 31, 1971, that he had 'acceded to the Postmaster General's request and have of my own volition foregone any retention rights under reduction in force regulations.' (JA 107). He was an employee who had both long tenure, 27 years of service, and a position of responsibility.[16] The sole evidence in the record that the resignation was not voluntary is Greinsky's after-the-fact assertion to that effect.
 
 
 31
 The issue for the court is whether there is 'evidence of substance in that record which supports the (Civil Service) Commission's view of the matter.' Dabney v. Freeman, supra, 123 U.S.App.D.C. at 168, 358 F.2d at 535. The Commission's finding that Greinsky's resignation was not coerced by particular representations made to him is supported by substantial evidence.
 
 
 32
 Affirmed.
 
 
 
 [1]
 Named as representative plaintiffs were five individuals, each representing an age and years-of-service category eligible for the early retirement offer. Robert R. Phillips represented the 55 years old/30 years of service category; Mary A. Karwoski represented the 60 years old/20 years of service category; Ira Greinsky represented the 25 years of service category; Ann Putney Flory represented the 50 years old/20 years of service category; and Birger F. Burman represented the 62 years old/5 years of service category. (JA 1-5)
 
 
 [2]
 Before 1969, the 'resignation requested' procedure had on occasion been employed, 'usually in cases of high-level policy-making positions following a change of administration.' FPM Letter No. 831-23, December 10, 1969 (JA 29)
 
 
 [3]
 Federal Personnel Manual Letter No. 831-23. This was later codified as Federal Personnel Manual Supplement 831-1, Subchapter S11-(d)(2). It was rescinded by the Commission as of January 1, 1973, by FPM Letter No. 831-32. (JA 223a)
 
 
 [4]
 The Postal Service bonus offer was in addition to the 4.5 percent cost-of-living increase approved by the Civil Service Commission for all civil service employees who retired before May 31, 1971. To get both, postal employees had to retire before May 31
 
 
 [5]
 See, e.g. Schy v. Susquehanna Corp., 419 F.2d 1112 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970)
 
 
 [6]
 See also City of Chicago v. General Motors Corp., 332 F.Supp. 285 (N.D.Ill.1971), affirmed, 467 F.2d 1262 (7th Cir. 1972); Ward v. Luttrell, 292 F.Supp. 162 (E.D.La.1968). Cf. Koen v. Long, 302 F.Supp. 1383 (E.D.Mo.1969), affirmed, 428 F.2d 876 (8th Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 827 (1971)
 
 
 [7]
 The allegations of the complaint recite that plaintiffs bring the action in behalf of all employees who 'were removed from the Department between May 16, 1971 and June 15, 1971, inclusive, and who would not otherwise have been removed or voluntarily retired between those dates.' (Pars. 3, 5, 7, 9, 11). The allegation to support a class action recites that the members of the various sub-classes (supra, note 1) comprise over 1,500 former Post Office employees, and the motion for certification of a class action begins with the allegation that plaintiffs, constituting over 1,500 former Post Office Department employees, are so numerous that joinder of all members of the class is impracticable
 
 
 [8]
 Compare Hansberry v. Lee, supra, 311 U.S. at 44:
 (it) is plain that in such circumstances all those alleged to be bound by the agreement would not constitute a single class in any litigation brought to enforce it. Those who sought to secure its benefits by enforcing it could not be said to be in the same class with or represent those whose interest was in resisting performance, for the agreement by its terms imposes obligations and confers rights on the owner of each plot of land who signs it. * * *
 Because of the dual and potentially conflicting interests of those who are putative parties to the agreement in compelling or resisting its performance, it is impossible to say, solely because they are parties to it, that any two of them are of the same class.
 
 
 [9]
 The problems of individual reinstatement were recently noted by the Supreme Court in Sampson v. Murray, 42 U.S.L.W. 4221, 4225, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). If reinstatement of the individual carries with it 'attendant tension,' reinstatement of hundreds carries the potential of tension multiplied to electrifying proportions
 
 
 [10]
 See, e.g., F.C.C. v. Schreiber, 381 U.S. 279, 296-297, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1969); Reisman v. Caplin, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1963); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 82 L.Ed. 638 (1938)
 
 
 [11]
 See, e.g., Brawner Bldg., Inc. v. Shehyn, 143 U.S.App.D.C. 125, 442 F.2d 847 (1971); Spanish Int'l Broadcasting Co. v. FCC, 128 U.S.App.D.C. 93, 102-104, 385 F.2d 615, 624-626 (1967); Neisloss v. Bush, 110 U.S.App.D.C. 396, 401, 293 F.2d 873, 878 (1961)
 
 
 [12]
 Compare Local 186, International Pulp, Sulphite and Paper Mill Workers v. Minnesota Mining and Manufacturing Co., 304 F.Supp. 1284 (N.D.Indiana 1969) (exhaustion not prerequisite to grant of affirmative relief where one member of class has exhausted his remedies) with Bowe v. Colgate-Palmolive Co., 272 F.Supp. 332 (S.D.Ind.1967) (only prohibitory injunction or declaratory judgment available for members of class who have not exhausted administrative remedies despite exhaustion by named plaintiff)
 
 
 [13]
 See, e.g., Barela v. United Nuclear Corporation, 462 F.2d 149 (10th Cir. 1972); Oatis v. Crown Zellerbach Corp., 398 F.2d 496 (5th Cir. 1968)
 
 
 [14]
 In Allison v. United States, 451 F.2d 1035, 196 Ct.Cl. 263 (1971), relied on by plaintiffs, some of the 15 plaintiffs had sought administrative action. The Civil Service Commission, taking the complaints together, ruled that no relief was available as a matter of law. In contrast, Greinsky's appeal was taken by him alone, and its resolution did not purport to decided the question of the coerciveness of the Postmaster's early retirement offer as a matter of law
 Appellants also rely on Farrell v. Gardner, 279 F.Supp. 427 (E.D.Pa.1968); but in that case the court held that plaintiff was unaware of the existence of administrative remedies and further found that those remedies clearly would have been unavailing. Neither condition obtains in the present case.
 
 
 [15]
 In Greinsky's affidavit in support of plaintiffs' motion for summary judgment (JA 181), Greinsky described the pressure to resign this way:
 When I retired in May, 1971 my decision to do so was not freely made but rather made because I had no other real alternative. I had to take the bonus and retire because at least then I would have provided some security for my family, whereas, had I remained and been R.I.F.ed, as I was assured would happen, I would have lost the bonus.
 
 
 [6]
 At the time of his resignation, Greinsky was Manager of the Training Section of the New York Regional Office